O

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

BRUCE W. ALBERTSON, JR.,                  )  Case No. CV 12-2508-JPR
                                          )
                 Plaintiff,               )
                                          )  MEMORANDUM OPINION AND ORDER
         vs.                              )  AFFIRMING THE COMMISSIONER
                                          )
CAROLYN W. COLVIN, Acting                 )
Commissioner of Social                    )
Security,[1]                              )
                                          )
                 Defendant.               )
                                          )

## I.   PROCEEDINGS

Plaintiff seeks review of the Commissioner's final decision denying his application for Social Security disability insurance benefits ("DIB").  The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge pursuant to 28 U.S.C. § 636(c).  This matter is before the Court on the parties' Joint Stipulation, filed November 29, 2012, which the Court has taken under submission without oral argument.  For the reasons stated

---

[1]   On February 14, 2013, Colvin became the Acting Commissioner of Social Security.  Pursuant to Federal Rule of Civil Procedure 25(d), the Court therefore substitutes Colvin for Michael J. Astrue as the proper Respondent.

below, the Commissioner's decision is affirmed and this action is dismissed.

**II.  BACKGROUND**

Plaintiff was born on February 6, 1970.  (Administrative Record ("AR") 134.)  He has a high school education and vocational training as an automobile salesperson.  (AR 46-47, 170.)  He previously worked as a salesperson and general manager for car dealerships.  (AR 48, 166.)

On November 25, 2009, Plaintiff filed an application for DIB.  (AR 134, 161.)  Plaintiff alleged that he had been unable to work since January 1, 2009, because of "Hypertensive Heart Disease, Diabetes, Hypercholesterolemia, Palpitations, Myocarditis, [and] Temp[o]ral A[r]teritis."[2]  (AR 165.)  His application was denied initially, on February 17, 2010, and upon reconsideration, on April 16, 2010.  (AR 78-83.)

On April 22, 2010, Plaintiff requested a hearing before an ALJ.  (AR 84-85.)  A hearing was held on January 10, 2011, at which Plaintiff, who was represented by counsel, appeared and testified; a vocational expert ("VE") also testified.  (AR 41-

---

[2]    Hypercholesterolemia is a condition characterized by very high levels of cholesterol in the blood. Hypercholesterolemia, Genetics Home Reference, http://ghr.nlm.nih.gov/condition/hypercholesterolemia (last updated May 6, 2013).  Myocarditis is an inflammation of the heart muscle and is an "uncommon disorder" usually caused by viral, bacterial, or fungal infections that reach the heart. Myocarditis, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ ency/article/000149.htm (last updated Mar. 22, 2013).  Temporal arteritis is a disorder causing inflammation and damage to the blood vessels that supply the head and neck.  See Temporal arteritis, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ ency/article/000448.htm (last updated Jan. 26, 2011).

73.)   In a written decision issued on January 28, 2011, the ALJ determined that Plaintiff was not disabled.  (AR 16-29.)   On February 9, 2011, Plaintiff requested review of the ALJ's decision and submitted additional medical evidence for the Appeals Council to review.  (AR 9, 15.)   On January 25, 2012, the Appeals Council considered the additional evidence but denied Plaintiff's request for review.  (AR 5-9.)   This action followed.

**III. STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole.  § 405(g); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than a scintilla but less than a preponderance.  Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1996).  "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner.  Id. at 720-21.

3

**IV.   THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted, or is expected to last, for a continuous period of at least 12 months.   42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

A.   The Five-Step Evaluation Process

The ALJ follows a five-step sequential evaluation process in assessing whether a claimant is disabled.   20 C.F.R. § 404.1520(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).   In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied.   § 404.1520(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied.   § 404.1520(a)(4)(ii).   If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., pt. 404, subpt. P, app. 1; if so, disability is conclusively presumed and benefits are awarded.

§ 404.1520(a)(4)(iii).  If the claimant's impairment or
combination of impairments does not meet or equal an impairment
in the Listing, the fourth step requires the Commissioner to
determine whether the claimant has sufficient residual functional
capacity ("RFC")[3] to perform his past work; if so, the claimant
is not disabled and the claim must be denied.
§ 404.1520(a)(4)(iv).  The claimant has the burden of proving
that he is unable to perform past relevant work.  <u>Drouin</u>, 966
F.2d at 1257.  If the claimant meets that burden, a prima facie
case of disability is established.  <u>Id.</u>  If that happens or if
the claimant has no past relevant work, the Commissioner then
bears the burden of establishing that the claimant is not
disabled because he can perform other substantial gainful work
available in the national economy.  § 404.1520(a)(4)(v).  That
determination comprises the fifth and final step in the
sequential analysis.  § 404.1520; <u>Lester</u>, 81 F.3d at 828 n.5;
<u>Drouin</u>, 966 F.2d at 1257.

    B.   <u>The ALJ's Application of the Five-Step Process</u>

At step one, the ALJ found that Plaintiff had not engaged in
any substantial gainful activity since January 1, 2009.  (AR 21.)
At step two, the ALJ concluded that Plaintiff had the severe
impairments of "chronic headaches and diabetes mellitus."  (<u>Id.</u>)
At step three, the ALJ determined that Plaintiff's impairments
did not meet or equal any of the impairments in the Listing, but
he specifically focused on Listings 1.00 (musculoskeletal system)

---

[3]    RFC is what a claimant can still do despite existing
exertional and nonexertional limitations.  20 C.F.R. § 404.1545;
<u>see</u> <u>Cooper v. Sullivan</u>, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

1   and 9.08 (endocrine disorders - diabetes mellitus).[4]  (AR 23.)

2   At step four, the ALJ found that Plaintiff retained the RFC to

3   perform the full range of light work.[5]  (Id.)  Based on the VE's

4   testimony, the ALJ concluded that Plaintiff was able to perform

5   his past relevant work as an automobile salesperson and manager.

6   (AR 25.)  At step five, the ALJ concluded that Plaintiff was not

7   disabled.  (AR 25-26.)

8   **V.   DISCUSSION**

9        Plaintiff alleges that the ALJ erred in doing the following:

10  (1) failing to find that Plaintiff had additional severe

11  impairments; (2) evaluating the medical evidence of Plaintiff's

12  visit to the Mayo Clinic in January 2010; (3) assessing

13  Plaintiff's credibility; (4) determining that Plaintiff could

14  perform his past relevant work; and (5) evaluating Plaintiff's

15  RFC.  (J. Stip. at 2.)  None of these contentions warrant

16

17       [4]   Listing 9.08 was deleted effective June 7, 2011.  See

18  Listing of Impairments - Adult Listings (Part A),
    http://www.ssa.gov/disability/professionals/bluebook/AdultListing

19  s.htm (last updated Apr. 10, 2013).  Impairments resulting from
    endocrine disorders such as diabetes are now evaluated under the

20  listings for other body systems.  See 20 C.F.R. § 404, subpt. P,
    app. 1, § 9.00B.

21

22       [5]   "Light work" is defined as involving "lifting no more
    than 20 pounds at a time with frequent lifting or carrying of

23  objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).  The
    regulations further specify that "[e]ven though the weight lifted

24  may be very little, a job is in this category when it requires a
    good deal of walking or standing, or when it involves sitting

25  most of the time with some pushing and pulling of arm or leg
    controls."  Id.  A person capable of light work is also capable

26  of "sedentary work," which involves lifting "no more than 10
    pounds at a time and occasionally lifting or carrying [small

27  articles]" and may involve occasional walking or standing.
    § 404.1567(a)-(b).

28

1  reversal.

2       A.   The ALJ Properly Evaluated the Medical Evidence

3       Plaintiff contends that the ALJ failed to properly consider

4  Plaintiff's additional impairments of "anxiety, asthma,

5  depression, hypertension, cardiac condition, polymyalgia

6  rheumatic,[6] [and] vascular abnormality, right temple area." (J.

7  Stip. at 3-4, 7-9.)  He further contends that the ALJ failed to

8  consider evidence from the Mayo Clinic that he was diagnosed with

9  "debilitating" "New Persistent Daily Headache" syndrome, and he

10 argues that the ALJ erred in failing to consider additional

11 impairments in the Listings.  (Id.)  Remand is not warranted on

12 any of these bases, however, because the ALJ provided legally

13 sufficient reasons for his evaluation of the medical evidence.

14       1.   Severity of additional impairments

15      Plaintiff first contends that the ALJ erred in finding that

16 his additional impairments were nonsevere or by failing to

17 address them altogether.  (J. Stip. at 3-4, 7-9.)

18      At step two of the sequential evaluation process, a

19 plaintiff has the burden to present evidence of medical signs,

20 symptoms, and laboratory findings that establish a medically

21 determinable physical or mental impairment that is severe and can

22 be expected to result in death or last for a continuous period of

23

24       [6]   Polymyalgia rheumatica is a condition that causes
25 muscle pain and stiffness in the neck, shoulders, and hips.  It
   sometimes occurs along with giant cell ateritis, a condition that
26 causes swelling of the arteries in the head.  It responds well to
   treatment; without treatment it will nonetheless generally go
27 away within a year or more.  See Polymyalgia Rheumatica,
   MedlinePlus, http://www.nlm.nih.gov/medlineplus/
28 polymyalgiarheumatica.html (last updated Apr. 10, 2013).

1  at least 12 months.  <u>Ukolov v. Barnhart</u>, 420 F.3d 1002, 1004-05

2  (9th Cir. 2005) (citing 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D));[7]

3  <u>see</u> 20 C.F.R. §§ 404.1520, 404.1509.  Substantial evidence

4  supports an ALJ's determination at step two that an impairment is

5  not severe when "there are no medical signs or laboratory

6  findings to substantiate the existence of a medically

7  determinable physical or mental impairment."  <u>Ukolov</u>, 420 F.3d at

8  1004-05 (citing SSR 96-4p).  An impairment may never be found on

9  the basis of the claimant's subjective symptoms alone.  <u>Id.</u> at

10  1005.

11      Step two is "a de minimis screening device [used] to dispose

12  of groundless claims."  <u>Smolen v. Chater</u>, 80 F.3d 1273, 1290 (9th

13  Cir. 1996).  Applying the applicable standard of review to the

14  requirements of step two, a court must determine whether an ALJ

15  had substantial evidence to find that the medical evidence

16  clearly established that the claimant did not have a medically

17  severe impairment or combination of impairments.  <u>Webb v.</u>

18  <u>Barnhart</u>, 433 F.3d 683, 687 (9th Cir. 2005); <u>see also</u> <u>Yuckert v.</u>

19  <u>Bowen</u>, 841 F.2d 303, 306 (9th Cir. 1988) ("Despite the deference

20  usually accorded to the Secretary's application of regulations,

21  numerous appellate courts have imposed a narrow construction upon

22  the severity regulation applied here.").  An impairment or

23  combination of impairments is "not severe" if the evidence

24  established only a slight abnormality that had "no more than a

25

26

27      [7]      A "medical sign" is "an anatomical, physiological, or
psychological abnormality that can be shown by medically
28  acceptable clinical diagnostic techniques."  <u>Ukolov</u>, 420 F.3d at
1005.

minimal effect on an individual's ability to work." <u>Webb</u>, 433
F.3d at 686 (citation omitted).

The ALJ found, based on substantial evidence in the record,
that Plaintiff's impairments of "hypertension, arthritis and a
chronic cough" were "nonsevere impairments that respond easily to
treatment." (AR 22.) He noted that a November 30, 2010 physical
examination "failed to show any significant problems" relating to
those impairments; Plaintiff's blood pressure and heart
examination were normal, there were no signs of hypertensive end
organ damage, and the examining doctor noted that Plaintiff's
cough was likely a side effect of medication he was taking and
therefore changed the medication. (AR 22, 660.) The ALJ noted
that evidence in the record showed that Plaintiff had normal
blood-pressure readings and mostly normal cardiac test results,
with only "slight" abnormalities in Plaintiff's temporal artery.
(AR 22, 567-68, 636, 639.)

With respect to Plaintiff's alleged arthritis, the ALJ
found, consistent with substantial evidence in the record, that
it was nonsevere, noting that a September 25, 2008 MRI of
Plaintiff's right hand showed only mild osteoarthritis of the
first carpometacarpal joint and minimal degenerative cyst
formation in the second metacarpal head. (AR 22, 498, 564-65.)
Tests and examinations performed in January and December 2009
showed no evidence of rheumatoid or inflammatory arthritis, and
treatment for Plaintiff's hand pain was limited to conservative
measures, such as "paraffin, analgesics, and not overusing the
hand." (AR 22, 498, 520.)

The ALJ also found, based on substantial evidence, that

9

Plaintiff's alleged depression and anxiety were nonsevere.  He
noted that the record did not contain any credible evidence of
limitations in activities of daily living or social interactions,
showed "only mild limitations in concentration, persistence or
pace," and contained no evidence that Plaintiff underwent any
episodes of decompensation.  (AR 22.)  Specifically, the ALJ
noted that consultative examining psychologist Dr. Lou Ellen
Sherrill's March 26, 2010 report found no signs of cognitive
dysfunction, memory problems, thought disturbances, impaired
processing or functioning, or IQ impairments.  (AR 22, 588-93.)
He noted that Dr. Sherrill's functional assessment limited
Plaintiff to performing simple to moderately complex tasks, but
her observation that Plaintiff would have "severe difficulty
tolerating ordinary work pressure and difficulty interacting with
others" was not supported by the record.  (AR 22, 593.)  The ALJ
noted that endocrinologist Dr. Etie Moghissi's progress notes
observed that Plaintiff never had problems understanding
instructions, and no doctor had ever reported that Plaintiff had
memory deficits or difficulty interacting with others.  (AR 22,
407-587, 661-75.)  He also noted that in April 2010, the state
agency medical consultant concluded that Plaintiff's depression
and anxiety were nonsevere, which was consistent with the
objective results of Dr. Sherrill's consultative examination and
the remainder of the record.  (AR 22, 596-601.)

     Plaintiff argues that the ALJ erred in failing to credit Dr.
Sherrill's statements that Plaintiff "has numerous symptoms of
depression that are totally associated with his medical
condition" and would have "severe difficulty tolerating ordinary

work pressures[,] severe difficulty interacting satisfactorily with others in the workplace, including the general public," and "severe difficulty observing basic work and safety standards in the workplace without difficulty." (J. Stip. at 8; see AR 591, 593.) An ALJ is not bound by the findings and other opinions of state-agency psychological consultants. 20 C.F.R. § 404.1527(e)(2)(i). The ALJ properly cited substantial evidence in the record showing that, despite Dr. Sherrill's comments, Plaintiff's mental impairment was not severe. (See AR 350, 489-90, 588-93, 661-75.) Moreover, Dr. Sherrill's opinion was inconsistent with her examination results, and the ALJ therefore did not err in rejecting it. See Allen v. Comm'r of Soc. Sec., 498 F. App'x 696, 697 (9th Cir. 2012) (ALJ did not err in rejecting consulting psychologist's opinion when "ALJ found evidence in the record indicating that [claimant's] mental impairment was not severe"); cf. Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003) (treating doctor's opinion properly rejected when treatment notes "provide no basis for the functional restrictions he opined should be imposed on [claimant]"); Valentine v. Comm'r, Soc. Sec. Admin., 574 F.3d 685, 692-93 (9th Cir. 2009) (contradiction between treating physician's opinion and his treatment notes constitutes specific and legitimate reason for rejecting treating physician's opinion).

Plaintiff also argues that he saw treating physician Dr. Roland Wallen in November 2006 for "discussion of his severe anxiety syndrome and stomach pain and his recent hospitalization for diagnosis and chest pain," which he cites as evidence that

11

his anxiety and depression were severe.  (J. Stip. at 8; AR 260.)
Dr. Wallen noted at that time that Plaintiff's "[a]nxiety
syndrome" was "from business issues and family issues" and
prescribed him Klonopin[8] "as needed for his management of
anxiety."  (AR 260.)  Dr. Wallen also noted that Plaintiff's
cardiac test results were "perfectly normal," he showed no signs
of arrhythmia or other heart conditions, and his "hypertension
and diabetes type II" were "under control."  (Id.)  But as the
ALJ properly found, substantial evidence in the record showed
that Plaintiff's mental functioning was normal and that he had no
difficulty interacting with others or performing various daily
activities.  (AR 22; see AR 588-93, 661-75.)  Indeed, in June
2008, nearly two years after the notes Plaintiff relies on, Dr.
Wallen found that Plaintiff's "mental status" was "[a]lert,
normal," Plaintiff "[a]nswers all questions appropriately," he
had "[n]o severe depression or suicidal ideation," and his other
vital signs were also normal.  (AR 350.)  The ALJ's finding that
Plaintiff's depression and anxiety were nonsevere was consistent
with the record.  (See also, e.g., AR 489-90 (noting in August
2009 that Plaintiff "reports . . . that his mood has been
unaffected," "does appear in good spirits," was "very pleasant,"
and reported "[n]o feeling depressed").)

    Although evidence in the record shows that Plaintiff likely
suffered from some degree of hypertension, cough, cardiac

_____

    [8]    Klonopin, also known as Clonazepam, is a medication
that decreases abnormal electrical activity in the brain and is
used to relieve panic attacks, among other uses.  Clonazepam,
MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/
meds/a682279.html (last updated May 2, 2013).

condition, arthritis, depression, and anxiety, Plaintiff has not pointed to any evidence in the record that those impairments significantly limited his ability to work. See 20 C.F.R. § 404.1520(c) (severe impairment is one that "significantly limits [claimant's] physical or mental ability to do basic work activities"). Thus, Plaintiff has not met his burden to present evidence of medical signs, symptoms, and laboratory findings establishing that those conditions were severe. Indeed, Plaintiff admitted that he did not see a mental-health professional for his depression or anxiety and that he treated those conditions with anti-anxiety medicine prescribed by his primary-care physician, which further indicates that his depression and anxiety were not severe.[9] (AR 51.) He also admitted that he did not see his cardiologist on a regular basis, indicating that his "cardiac condition" was also not severe. (Id.) To the extent he claims he had asthma, Plaintiff does not cite to any objective evidence in the record confirming that diagnosis; a CT scan of Plaintiff's lungs in April 2007 showed no

---

[9] Failure to seek mental-health treatment may not be a valid reason for rejecting a claimant's mental-health claims. See Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996) (holding that although a claimant "may have failed to seek psychiatric treatment for his mental condition, it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation") (internal quotation marks and citation omitted). To the extent the ALJ relied on that as evidence that Plaintiff's mental impairment was not severe, however, any error was harmless because the vast weight of the evidence in the record supports the ALJ's finding that Plaintiff's mental impairment was not severe. See Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (ALJ's error harmless when "inconsequential to the ultimate nondisability determination").

evidence of lung disease.  (AR 580-81.)  Moreover, in November
2010 Plaintiff's new primary-care physician, Dr. Navid Hakimian,
noted that Plaintiff had "[n]o history of asthma."  (AR 660.)
Accordingly, Plaintiff did not carry his burden at step two of
the analysis to show that the other impairments of which he
complains were severe.

In any event, even if the ALJ erred by finding the
additional impairments nonsevere, that error was harmless because
he considered all of Plaintiff's impairments, both severe and
nonsevere, when determining his RFC at step four.  See Lewis v.
Astrue, 498 F.3d 909, 911 (9th Cir. 2007) (failure to address
particular impairment at step two harmless if ALJ fully evaluates
claimant's medical condition in later steps of sequential
evaluation process); see also Stout v. Comm'r, Soc. Sec. Admin.,
454 F.3d 1050, 1055 (9th Cir. 2006) (ALJ's error harmless when
"inconsequential to the ultimate nondisability determination").
Specifically, the ALJ analyzed Plaintiff's claims of depression
and anxiety, joint pain, stiffness, and problems with gait at
step four and concluded, consistent with the record, that they
did not affect his ability to perform light work.  (AR 24-25.)

With respect to Plaintiff's alleged polymyalgia rheumatica
and right-temple vascular abnormality, the ALJ properly accounted
for those conditions in finding that Plaintiff's headaches were a
severe impairment.  The ALJ noted, consistent with the record,
that Plaintiff had swelling in the right side of the forehead and
chronic headaches but that his neurological examinations revealed
only mild abnormalities.  (AR 21; see AR 351-52, 393, 409-14,
420-22, 488-95, 579, 627-28.)  Plaintiff notes that evidence in

14

the record showed he had symptoms associated with these

conditions (J. Stip. at 3), but he fails to explain how the ALJ's

evaluation of the severity of Plaintiff's symptoms was

inconsistent with the record as a whole.  Plaintiff is thus not

entitled to remand on this ground.  See Bayliss v. Barnhart, 427

F.3d 1211, 1217 (9th Cir. 2005) (quoting Meanel v. Apfel, 172

F.3d 1111, 1113 (9th Cir. 1999) ("The claimant bears the burden

of proving that she is disabled.")).

### 2.  Mayo Clinic evidence

Plaintiff next contends that the ALJ erred in failing to

consider evidence from the Mayo Clinic that Plaintiff suffered

from New Persistent Daily Headache, a "debilitating" condition.

(J. Stip. at 4, 9.)  As explained below, the ALJ properly

considered the Mayo Clinic evidence as well as other evidence in

the record regarding Plaintiff's chronic headaches, and reversal

is therefore not warranted on this basis.

### a.  *Applicable law*

Three types of physicians may offer opinions in social

security cases: "(1) those who treat[ed] the claimant (treating

physicians); (2) those who examine[d] but d[id] not treat the

claimant (examining physicians); and (3) those who neither

examine[d] nor treat[ed] the claimant (non-examining

physicians)."  Lester, 81 F.3d at 830.  A treating physician's

opinion is generally entitled to more weight than the opinion of

a doctor who examined but did not treat the claimant, and an

examining physician's opinion is generally entitled to more

weight than that of a nonexamining physician.  Id.

The opinions of treating physicians are generally afforded

15

more weight than the opinions of nontreating physicians because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant.  Smolen, 80 F.3d at 1285.  If a treating physician's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight. 20 C.F.R. § 404.1527(c)(2).  If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's area of specialization, and other factors.  20 C.F.R. § 404.1527(c)(2)-(6).

When a treating or examining doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons.  Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008) (quoting Lester, 81 F.3d at 830-31).  When a treating or examining physician's opinion conflicts with another doctor's, the ALJ must provide only "specific and legitimate reasons" for discounting the treating doctor's opinion.  Id.  Further, the ALJ "need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings."  Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); accord Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004).  The weight given an examining physician's opinion, moreover, depends on whether it is

16

consistent with the record and accompanied by adequate

explanation, among other things.  20 C.F.R. § 404.1527(c)(3)-(6).

b.   *Relevant facts*

On October 24, 2007, Plaintiff saw Dr. Wallen after visiting
the emergency room two days prior for "sudden swelling in the
forehead the size of a golf ball with severe pain."  (AR 587.)
Dr. Wallen noted that the right side of Plaintiff's forehead
showed "some elevation" and "some tenderness and soft swelling,
non-throbbing but it is tender," but all of Plaintiff's vital
signs and other examination results were normal.  (<u>Id.</u>)  He
referred Plaintiff for an MRA[10] and further testing.  (<u>Id.</u>)

On October 30, 2007, Plaintiff underwent MRI and MRA
examinations of his brain, head, and neck.  (AR 576-79.)  The
exams revealed no significant abnormalities.  (<u>Id.</u>)  On December
17, 2007, Plaintiff underwent another MRA of his neck, which
showed that his arteries were normal.  (AR 575.)  On March 6,
2008, Plaintiff had an MRI of his brain, which revealed "a minute
mucus retention cyst in the base of the right maxillary sinus";
all other results were normal.  (AR 573-74.)  It was noted that
there was "no abnormality of the right frontal scalp or cranium."
(AR 574.)  On March 25, 2008, Plaintiff underwent a scan of a
"bump" on his right frontal scalp.  (AR 571-72.)  It showed no
aneurysms or vascular malformations, and Plaintiff's
"intracranial vascular anatomy" was noted as "essentially

---

[10]   A Magnetic Resonance Angiogram ("MRA") is a type of MRI
scan that uses a magnetic field and pulses of radio wave energy
to provide pictures of blood vessels.  <u>Magnetic Resonance
Angiogram (MRA)</u>, WebMD, http://www.webmd.com/heart-disease/
magnetic-resonance-angiogram-mra (last updated June 30, 2010).

normal." (AR 571.) On April 23, 2008, Plaintiff had an
ultrasound evaluation of his scalp in the right frontal area.
(AR 570.) It revealed "normal appearance of subgaleal soft
tissues" and "[n]o significant abnormal vascularity." (Id.)

On June 27, 2008, Dr. Wallen referred Plaintiff to surgery
at Saint John's Health Center in Santa Monica to remove a
"vascular abnormality" from his "right temple area which appeared
initially like temporal arteritis until an angiogram was
performed." (AR 349.) On July 9, 2008, Plaintiff had the mass
on his right scalp and forehead surgically removed; a biopsy was
also performed on the mass. (AR 351.) The surgeon noted that
Plaintiff felt that the mass "is significantly contributing
towards the pain" in his head, but the doctor was "somewhat leery
of this diagnosis" because he did not "feel that biopsy of this
will likely affect [Plaintiff's] pain symptoms in a significant
manner." (Id.) The biopsy showed that the veins in the mass had
"reactive endothelial changes and mild intimal fibrosis," but the
mass was not malignant. (AR 393.)

On December 3, 2008, Plaintiff saw Dr. Alexander Hersel for
an occipital nerve block to relieve his headaches. (AR 505-06.)
Dr. Hersel performed the procedure and noted that Plaintiff
tolerated it well and "stated that he had significant reduction
in the radiating pain above the scalp to the eye as well as the
hyperalgesia overlying the skin of the scalp." (AR 506.)

On August 4, 2009, Plaintiff was referred by Dr. Wallen to
Dr. Talin Evazyan at UCLA Medical Center. (AR 488.) Dr. Evazyan
recounted Plaintiff's medical history of headaches, beginning in
October 2007; he noted that Plaintiff's past neurological test

1  results were generally normal and Plaintiff's headaches continued

2  after biopsy of his temporal artery.  (Id.)  Dr. Evazyan

3  diagnosed Plaintiff with "a neuroma"[11] and recommended "local

4  infiltration of the site," "lidocaine patches" for "symptomatic

5  relief," Voltaren gel for local pain relief, and supratrochlear

6  and supraorbital nerve blocks.  (AR 490.)  He also noted that

7  Plaintiff "might even benefit from a visit to Mayo Clinic where a

8  specialist can offer a more definite diagnosis for him."  (Id.)

9       On January 4, 2010, Plaintiff visited the Mayo Clinic, where

10 he had MRI exams of his face, head, and neck.  (AR 616.)  They

11 revealed "[n]o evidence of a right frontal subcutaneous vascular

12 malformation."  (Id.)  On January 5, 2010, Plaintiff saw Dr.

13 Jaspreet K. Dhaliwal at the Mayo Clinic.  (AR 627-29.)  Dr.

14 Dhaliwal recounted Plaintiff's history of headaches since October

15 2007 and his description of his subjective symptoms, noting that

16 Plaintiff rated his "constant headache" "a 4/10 in severity" but

17 "[t]hree to four times per week, he will notice enlargement of

18 the right forehead lesion, and his pain will increase to a 10/10

19 in severity."  (AR 627.)  Dr. Dhaliwal performed a physical

20 examination of Plaintiff and noted that Plaintiff had "some

21 slight asymmetry about the size of a quarter on the right

22 forehead just above the lateral aspect of his eyebrow" that was

23 "soft and nonpulsatile in nature," but all other signs were

24 normal.  (AR 628.)  He then made the following notes regarding

25

26

27      [11]   A neuroma is a benign tumor that arises from a nerve.
   Neuroma definition, eMedicineHealth,

28 http://www.emedicinehealth.com/script/main/art.asp?articlekey=455
   4 (last visited May 10, 2013).

his treatment plan for Plaintiff:

> Mr. Albertson gives a history of a pulsatile forehead lesion and headaches, which is suspicious for a vascular malformation.  In reviewing his MRI, I do not see anything obvious for that.  He is experiencing chronic daily headaches, which are debilitating.  I would appreciate input from our neurologists.  Given the fact that the patient has had surgery since his March 2008 MRI scan, I will repeat an MRI and compare it to his previous scan.  I will also request his slides from his temporal artery biopsy.  I do not feel this is consistent with temporal arteritis, and I also am having some difficulty attributing to [sic] the magnitude of his symptoms to his forehead lesion.  I will see him back following the neurology evaluation and MRI.

(AR 628.)

On January 7, 2010, Plaintiff returned to the Mayo Clinic for a follow-up visit with Dr. Dhaliwal.  (AR 619-24.)  Dr. Dhaliwal reported that Plaintiff's MRI "does not demonstrate any focal acute abnormality to account for his headaches" and agreed with past assessments that Plaintiff suffered from "chronic daily headache and the forehead asymmetry is likely unrelated."  (AR 619.)

### c. *Analysis*

The ALJ cited the Mayo Clinic reports in his written decision when noting that Plaintiff "reports a history of a mass on the right side of the forehead and chronic headaches since October 2007."  (AR 21 (citing AR 627).)  Consistent with Dr.

Dhaliwal's evaluation, he then recounted the MRI results and physician's reports from 2008 and 2009 showing no significant abnormalities, no connection between the mass on Plaintiff's forehead and his headaches, and no other explanation for Plaintiff's headaches. (AR 21 (citing AR 614-28).) He also cited the Mayo Clinic reports in noting that Plaintiff's daily activities and social interactions were not impaired by his mental or physical conditions. (AR 24 (citing AR 614-28 (showing that Plaintiff did not report impairment in activity or social interactions)).)

The ALJ's opinion was consistent with the evidence from the Mayo Clinic. As the ALJ noted, Plaintiff's MRI results revealed no significant abnormalities (AR 616), and Plaintiff's headaches appeared unrelated to the mass on his forehead (AR 619). Like the other evidence that the ALJ discussed in more detail, the records from the Mayo Clinic ultimately show that despite extensive testing, doctors could not find an explanation for Plaintiff's headaches. (See AR 619, 628.) Dr. Dhaliwal even expressed some skepticism concerning Plaintiff's subjective symptoms, stating that he was "having some difficulty attributing to [sic] the magnitude of [Plaintiff's] symptoms to his forehead lesion" and expressing doubt that Plaintiff's headaches were attributable to a vascular malformation or temporal arteritis, as Plaintiff appears to have claimed. (See AR 628.)

Plaintiff argues that the ALJ erred in failing to credit Dr. Dhaliwal's characterization of his headaches as "debilitating" and failing to note a diagnosis of "New Persistent Daily Headache." (J. Stip. at 4.) These contentions do not warrant

1   reversal.  Dr. Dhaliwal's use of the word "debilitating" appears

2   to reference Plaintiff's own description of his symptoms.  (See

3   AR 628.)  In any event, as discussed below, the ALJ properly

4   discounted Plaintiff's credibility, and thus he did not need to

5   credit any medical opinions based on Plaintiff's subjective

6   complaints.  See Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th

7   Cir. 2001) (when ALJ properly discounted claimant's credibility,

8   he was "free to disregard" doctor's opinion that was premised on

9   claimant's subjective complaints); Morgan v. Comm'r of Soc. Sec.

10  Admin., 169 F.3d 595, 602 (9th Cir. 1999) (when physician's

11  opinion of disability premised "to a large extent" upon

12  claimant's own accounts of symptoms, limitations may be

13  disregarded if complaints have been "properly discounted").

14  Moreover, to the extent Dr. Dhaliwal's characterization of

15  Plaintiff's headaches as "debilitating" was intended to be an

16  evaluation of Plaintiff's ability to work, the ALJ was free to

17  disregard it.  See 20 C.F.R. § 404.1545(e); SSR 96-5p, 1996 WL

18  374183, at *5 (Commissioner must make ultimate disability

19  determination; opinions from medical sources about whether a

20  claimant is "disabled" or "unable to work" "can never be entitled

21  to controlling weight or given special significance"); McLeod v.

22  Astrue, 640 F.3d 881, 885 (9th Cir. 2011) (noting that "a

23  treating physician ordinarily does not consult a vocational

24  expert or have the expertise of one"; treating physician's

25  evaluation of claimant's ability to work thus not entitled to

26  deference because "[t]he law reserves the disability

27  determination to the Commissioner").

28      Regarding the diagnosis of "New Persistent Daily Headache,"

Plaintiff fails to explain how that term carries a different meaning than "chronic headaches," the term the ALJ used to describe Plaintiff's condition.  Indeed, although Dr. Dhaliwal described Plaintiff's condition as "New Persistent Daily Headache" on one page of his notes (AR 623), on several other pages he refers to it as simply "headaches" or "chronic daily headaches" (AR 619-20, 627, 628).  Plaintiff even used the two terms interchangeably in his testimony.  (See AR 60.)

Plaintiff has failed to show how the ALJ's decision was inconsistent with the record.  His contentions therefore do not warrant reversal.

### 3.   Application of Listings

Plaintiff also argues that the ALJ improperly failed to consider Listings 4.00 et seq. and 12.06 in determining that Plaintiff's impairments did not meet or equal a listed impairment.  (J. Stip. at 7.)  Reversal is not warranted on this basis.

Listed impairments are those that are "so severe that they are irrebuttably presumed disabling, without any specific finding as to the claimant's ability to perform his past relevant work or any other jobs."  Lester, 81 F.3d at 828.  A step-three finding of disability must be based on medical evidence from acceptable medical sources only, i.e., licensed psychologists or physicians designated by the Commissioner.  20 C.F.R. §§ 404.1529(d)(3), 404.1526(c), (d).  The claimant has the initial burden to prove an impairment under an identified Listing.  Sullivan v. Zebley, 493 U.S. 521, 530-33, 110 S. Ct. 885, 891-92, 107 L. Ed. 2d 967 (1990).

1    An ALJ's decision that a plaintiff did not meet a Listing
2  must be upheld if it was supported by "substantial evidence."
3  See Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th
4  Cir. 2006).  Substantial evidence is "more than a mere scintilla
5  but less than a preponderance; it is such relevant evidence as a
6  reasonable mind might accept as adequate to support a
7  conclusion."  Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir.
8  1997).  When evidence was susceptible to more than one rational
9  interpretation, the Court must uphold the ALJ's conclusion as
10 long as substantial evidence existed to support it.   Id.

11   An ALJ "must evaluate the relevant evidence before
12 concluding that a claimant's impairments do not meet or equal a
13 listed impairment."  Lewis v. Apfel, 236 F.3d 503, 512 (9th Cir.
14 2001).  The ALJ, however, need not "state why a claimant failed
15 to satisfy every different section of the listing of
16 impairments."  Gonzalez v. Sullivan, 914 F.2d 1197, 1201 (9th
17 Cir. 1990) (finding ALJ did not err in failing to state what
18 evidence supported conclusion that, or discuss why, claimant's
19 impairments did not satisfy a Listing).  Moreover, the ALJ "is
20 not required to discuss the combined effects of a claimant's
21 impairments or compare them to any listing in an equivalency
22 determination, unless the claimant presents evidence in an effort
23 to establish equivalence."  Burch v. Barnhart, 400 F.3d 676, 683
24 (9th Cir. 2005) (citing Lewis, 236 F.3d at 514).

25   As an initial matter, Plaintiff has not presented any
26 evidence that he argued to the ALJ that his impairments met or
27 equaled Listings 4.00 et seq. or 12.06.  "It is unnecessary to
28 require the Secretary, as a matter of law, to state why a

claimant failed to satisfy every different section of the listing of impairments." <u>Gonzalez</u>, 914 F.2d at 1201.  The ALJ did not err in failing to consider listings that Plaintiff never identified were at issue.  <u>Burch</u>, 400 F.3d at 683 ("An ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence."); <u>Bowman v. Astrue</u>, 2011 WL 3323383, at *4 (C.D. Cal. Aug. 2, 2011) (rejecting plaintiff's argument that ALJ erred in not considering identified Listing when plaintiff "[did] not present any evidence that he argued to the ALJ that the combination of his impairments met [that Listing]").

In any event, the evidence of record was insufficient to show that Plaintiff met either Listing.  Plaintiff asserts that his "hypertension, mass on his head, and coronary angiography" mandated a finding of disability under Listings 4.00 <u>et seq.</u> and 12.06.  (J. Stip. at 7 (citing AR 616-24, 630-44).)  He has failed to meet his burden to show how these listings were satisfied.

Listing 4.00 covers impairments of the cardiovascular system.  20 C.F.R. § 404, subpt. P, app. 1, § 4.00 <u>et seq.</u>  A claimant can meet Listing 4.04C (Coronary artery disease) if he can demonstrate "by angiography (obtained independent of Social Security disability evaluation)" evidence showing:

    a.    50 percent or more narrowing of a nonbypassed left main coronary artery; or

    b.    70 percent or more narrowing of another nonbypassed coronary artery; or

c.   50 percent or more narrowing involving a long
(greater than 1 cm) segment of a nonbypassed
coronary artery; or

d.   50 percent or more narrowing of at least two
nonbypassed coronary arteries; or

e.   70 percent or more narrowing of a bypass graft
vessel; and

2.   Resulting in very serious limitations in the ability
to independently initiate, sustain, or complete
activities of daily living.

Id. § 4.04C.   To meet a Listing based on hypertension (high blood
pressure), a claimant must show that it has affected other body
systems, such as the heart, brain, kidneys, or eyes.   Id.
§ 104.00F.   In the case of the heart, a claimant must present
evidence of heart disease resulting in one or more of the
following four consequences:

(i)    Chronic heart failure or ventricular
dysfunction.

(ii)   Discomfort or pain due to myocardial ischemia,
with or without necrosis of heart muscle.

(iii)  Syncope, or near syncope, due to inadequate
cerebral perfusion from any cardiac cause,
such as obstruction of flow or disturbance in
rhythm or conduction resulting in inadequate
cardiac output.

(iv)   Central cyanosis due to right-to-left shunt,
reduced oxygen concentration in the arterial
blood, or pulmonary vascular disease.

26

1   *Id.* § 4.00A.

2       Plaintiff has not met his burden to show that he met or
3   equaled any of the impairments in Listing 4.00 *et seq.*  As the
4   ALJ correctly found, tests performed in 2008, 2009, and 2010
5   showed that Plaintiff's blood pressure was normal and he had no
6   cardiac dysfunction.  (AR 22, 567-68, 632, 636-39.)  A June 6,
7   2008 angiogram showed only slight abnormalities in Plaintiff's
8   temporal artery.  (AR 22, 567-68.)  A physical examination
9   performed in November 2010 revealed normal blood pressure and
10  normal heart functioning.  (AR 636-39.)  Plaintiff has not met
11  his burden to present evidence showing that he satisfies any of
12  the above-listed criteria.

13      Listing 12.06 covers anxiety-related disorders.  *Id.*
14  § 12.06.  To meet Listing 12.06, a claimant must present the
15  following evidence:

16      A.   Medically documented findings of at least one of the
17           following:

18           1.   Generalized persistent anxiety accompanied by
19           three out of four of the following signs or symptoms:

20                    a.   Motor tension; or
21                    b.   Autonomic hyperactivity; or
22                    c.   Apprehensive expectation; or
23                    d.   Vigilance and scanning;

24      or

25           2.   A persistent irrational fear of a specific
26           object, activity, or situation which results in a
27           compelling desire to avoid the dreaded object, activity,
28           or situation; or

27

3.   Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4.   Recurrent obsessions or compulsions which are a source of marked distress; or

5.   Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

And

B.   Resulting in at least two of the following:

1.   Marked restriction of activities of daily living; or

2.   Marked difficulties in maintaining social functioning; or

3.   Marked difficulties in maintaining concentration, persistence, or pace; or

4.   Repeated episodes of decompensation, each of extended duration.

OR

C.   Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. § 404, subpt. P, app. 1, § 12.06.

Plaintiff has not met his burden to show that he met or equaled Listing 12.06.  As discussed above, there is no evidence that Plaintiff underwent any psychiatric treatment for his anxiety or that it was debilitating in any way; indeed, most of the evidence in the record suggests that Plaintiff's mental

1  functioning was normal.  (See AR 350, 489-90, 588-93, 661-75.)

2      Plaintiff has therefore failed to meet his burden to show

3  how any listings were satisfied.  Reversal is not warranted on

4  this basis.

5      B.    The ALJ Did Not Err in Assessing Plaintiff's

6            Credibility

7      Plaintiff argues that the ALJ failed to provide clear and

8  convincing reasons for discounting his credibility.  (J. Stip. at

9  10-13, 16-17.)  Because the ALJ did provide clear and convincing

10  reasons supporting his evaluation of Plaintiff's testimony and

11  those reasons were supported by substantial evidence in the

12  record, reversal is not warranted on this basis.

13          1.    Applicable law

14      An ALJ's assessment of pain severity and claimant

15  credibility is entitled to "great weight."  See Weetman v.

16  Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779

17  F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not required to

18  believe every allegation of disabling pain, or else disability

19  benefits would be available for the asking, a result plainly

20  contrary to 42 U.S.C. § 423(d)(5)(A)."  Molina v. Astrue, 674

21  F.3d 1104, 1122 (9th Cir. 2012).  In evaluating a claimant's

22  subjective symptom testimony, the ALJ engages in a two-step

23  analysis.  See Lingenfelter, 504 F.3d at 1035-36.  "First, the

24  ALJ must determine whether the claimant has presented objective

25  medical evidence of an underlying impairment [that] could

26  reasonably be expected to produce the pain or other symptoms

27  alleged."  Id. at 1036 (internal quotation marks omitted).  If

28  such objective medical evidence exists, the ALJ may not reject a

29

claimant's testimony "simply because there is no showing that the impairment can reasonably produce the *degree* of symptom alleged." Smolen, 80 F.3d at 1282 (emphasis in original).  When the ALJ finds a claimant's subjective complaints not credible, the ALJ must make specific findings that support the conclusion.  See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010).  Absent affirmative evidence of malingering, those findings must provide "clear and convincing" reasons for rejecting the claimant's testimony.[12]  Lester, 81 F.3d at 834.  If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing."  Thomas, 278 F.3d at 959.

### 2.  Relevant facts

In an undated Disability Report, Plaintiff claimed that his "headaches made it impossible for him to walk around the agency or to sit in an office with the lights on for long periods of time or use the computer to due [sic] any paperwork"; Plaintiff was "in constant pain, so he is unable to concentrate" and "is always fatigued due to lack of sleep caised [sic] by the pain"; and Plaintiff "feels depressed because has [sic] gone through many treatments and have [sic] been unable to solve his illness." (AR 165.)  In a later Disability Report, Plaintiff stated that

---

[12]    There is arguably some evidence in the record of malingering.  For example, in January 2010, Dr. Dhaliwal noted that he was "having some difficulty attributing to [sic] the magnitude of [Plaintiff's] symptoms to his forehead lesion" and expressed doubt that Plaintiff's headaches were attributable to a vascular malformation or temporal arteritis, as Plaintiff appears to have claimed.  (See AR 628.)  In any event, as discussed herein, the ALJ provided clear and convincing reasons for rejecting Plaintiff's credibility.

30

his migraines had gotten "worse," his blood pressure had gotten

"higher," and he had "developed severe arthritis in my hands and

my back from taking high doses of Prednisone to try to control my

headaches." (AR 188.) He also stated that his "heart

palpitations have gotten worse from my high blood pressure," his

"eyes have become photosensitive from the new medication I was

prescribed," and his "arthritis has gotten worse since they took

me off some of my painkillers." (Id.) He further stated that he

had "trouble concentrating since my migraines have gotten worse"

and had "trouble with my heart since my pain has become worse."

(Id.) He stated that he was "unable to do my job anymore because

I can no longer concentrate like I use [sic] to working with

numbers and financing." (AR 195.)

When Dr. Sherrill examined Plaintiff in March 2010, she

noted that he drove himself to the clinic for his evaluation and

that he reported that he was "able to perform all basic household

chores unassisted and is capable of running errands and going

shopping alone, but prefers not to do so." (AR 588, 590.) He

reported "good relationships with family members and good

relationships with friends, acquaintances and neighbors." (AR

590.) She noted that he "stated that he is able to cook meals

without help, but does not like doing so," and "[h]is current

preferred activities include watching television." (AR 590.)

Plaintiff also reported that he was able to "perform all self-

care activities independently, including dressing and bathing

himself," and was able to manage his own finances and drive his

own car. (AR 590.)

Dr. Sherrill noted that Plaintiff reported the following

symptoms:

According to the claimant, his primary problems and disabilities are medical. He stated that his primary disability is that he has catastrophic medical problems. The claimant has severe and debilitating migraine headaches every day. The claimant has been placed on disability because he was in such extraordinary pain that he was not able to do his job. The claimant has seen numerous physicians including physicians at the Mayo Clinic. He received a different diagnosis from almost every physician. The claimant stated that as a result, he is chronically frustrated and distracted, resulting in an inability to concentrate and focus.

Additionally, the claimant stated that he experiences routine lapses in memory. The claimant recognizes that he has an excellent memory but he is extraordinarily distracted because of his medical problems. The claimant reported that he now has chronic anxiety and depression. The claimant has extraordinary financial worries because of his medical condition and lack of employment. He has three small children. The claimant is now chronically depressed because of the catastrophic medical problems and his pain along with pain management problems. However, he denied any history of suicidal ideation. He has no history of homicidal thoughts. The claimant further reported impaired sleep and appetite.

(AR 589.)

At the hearing, Plaintiff testified that he had not worked since January 1, 2009. (AR 47.) He stated that Dr. Wallen advised him to stop working at that time because "the stress was showing too much on me; the strain because I was getting sicker." (AR 48.) He testified that he saw a primary-care physician, a neurologist, and a pulmunologist but did not see a mental-health professional and did not see his cardiologist "on a regular basis." (AR 48-51.) He stated that he stopped working because of "absolutely unbearable" pain on the right side of his head "that just never stops." (AR 51.) He stated that he also had hypertension that was controlled "to an extent" with medication but flared up when he had "severe pain," and he also had "heart palpitations" caused by his headache pain. (AR 53, 66.) He stated that his headache had "not gone away" since his symptoms began, and he recounted that the medical tests he underwent between 2008 and 2010 did not produce a conclusive diagnosis. (AR 53-56.) He testified that his doctors told him there was "no cure" for his headaches and that they were becoming "more severe" over time. (AR 60-61.)

As to his daily activities, Plaintiff testified that he "[didn't] really do too much of anything" during the day but was able to drive to the grocery store, post office, and pharmacy. (AR 56-57.) He stated that he did not do yard work or laundry and took care of his children only on days when the nanny did not work. (AR 57-58, 69.) He stated, however, that he drove to his eldest daughter's school to meet with the vice principal once every four months because his daughter had a learning disability. (AR 58.) He stated that he did not socialize with friends or

family and stayed home while his wife participated in social activities, but he saw his family "at home to have dinner with them and talk to them and stuff." (AR 58-59, 69.) He claimed that he lied down and slept most of the day and did not read or watch TV "because that's more of a distraction and actually causes more of a headache." (AR 64.) He stated that some of his medications made him drowsy. (AR 65.) He testified that he slept "several hours during the day," from approximately 1 to 5 p.m. (AR 68.)

Plaintiff also testified that he had difficulty standing and walking because of osteoarthritis, which was diagnosed in June 2009 and was caused by taking Prednisone. (AR 61.) He testified that he could stand and walk for "[t]wenty or thirty minutes" before needing to sit, could sit "for at least an hour," and could carry or lift "[l]ess than five to ten pounds." (AR 62.) He testified that his diabetes was "out of control" and his blood sugars were "[i]ncredibly high," which made him feel "very shaky." (AR 66-67.)

With respect to his headaches, Plaintiff testified that on his "best" day his pain was a "three" and on his "worst" day it was "at a 10," and his pain reached level 10 "about twice a week." (AR 64.) He stated that he was "like a five to seven most of the time." (Id.) He testified that he could not work because his headache pain would cause him to lose concentration, "and with the medication I take that caused it just to be that much worse." (AR 68.)

3. **Analysis**

The ALJ found that Plaintiff's "medically determinable

34

impairments could reasonably be expected to cause the alleged symptoms," but his "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with" the ALJ's RFC assessment. (AR 24.) The ALJ noted that despite Plaintiff's claims of severe depression and anxiety, he had never sought mental-health treatment, and Dr. Sherrill's examination revealed no cognitive dysfunctions, memory problems, or thought impairments. (AR 22, 24.) He then made the following findings regarding Plaintiff's daily activities:

> In addition to the objective findings of no severe mental impairment, neither activities of daily living nor social interactions were restricted by either mental or physical conditions (Testimony; [(AR 614-28, 659-75)]). The claimant does basic household chores, shops, cooks, and drives three times a week [(AR 590).][13] He spends much of his time watching television, a sedentary activity. He likes to play the guitar [(AR 498)].[14] The claimant reports good relations with family and friends when he described his medical-social history to Dr. Sherrill. He goes to his child's school to review the child's IEP (Testimony).

---

[13]   The ALJ cited Exhibit "9F/3" in support of this assertion. That appears to have been a typographical error – the evidence to which the ALJ referred in fact appears on page 3 of Exhibit 6F (AR 590).

[14]   This citation also contains a typographical error. The ALJ cited Exhibit "11F/92," but the evidence he discusses appears on page 92 of Exhibit 5F (AR 498).

1  (AR 24.)   The ALJ then discussed the lack of support in the

2  record for Plaintiff's claims regarding his medical conditions.

3  (AR 24-25.)

4      Reversal is not warranted based on the ALJ's alleged failure

5  to make proper credibility findings or properly consider

6  Plaintiff's subjective symptoms.  As discussed above, the ALJ's

7  evaluation of the medical evidence was consistent with the

8  record; his rejection of Plaintiff's testimony to the extent it

9  was inconsistent with the objective evidence was therefore

10 proper.   See Carmickle, 533 F.3d at 1161 ("Contradiction with the

11 medical record is a sufficient basis for rejecting the claimant's

12 subjective testimony."); Lingenfelter, 504 F.3d at 1040 (in

13 determining credibility, ALJ may consider "whether the alleged

14 symptoms are consistent with the medical evidence"); Burch, 400

15 F.3d at 681 ("Although lack of medical evidence cannot form the

16 sole basis for discounting pain testimony, it is a factor that

17 the ALJ can consider in his credibility analysis."); Kennelly v.

18 Astrue, 313 F. App'x 977, 979 (9th Cir. 2009) (same); see also

19 Tommasetti v. Astrue, 533 F.3d 1035, 1040 (9th Cir. 2008) (ALJ

20 may infer that claimant's "response to conservative treatment

21 undermines [claimant's] reports regarding the disabling nature of

22 his pain").  Indeed, the ALJ's finding that the "intensity" of

23 Plaintiff's reported symptoms could not be reconciled with the

24 medical evidence was consistent with Dr. Dhaliwal's observation

25 that he was "having some difficulty attributing to [sic] the

26 magnitude of [Plaintiff's] symptoms to his forehead lesion" and

27 had doubts that Plaintiff's headaches were attributable to a

28 vascular malformation or temporal arteritis, as Plaintiff appears

1    to have claimed.  (See AR 24. 628.)

2         Moreover, as the ALJ noted, Plaintiff admitted to Dr.

3    Sherrill that he was able to do a wide variety of daily

4    activities, including driving, doing household chores, cooking,

5    performing self-care functions, handling money, and socializing

6    with his family, but simply "prefers not to do so." (AR 24,

7    590.)  Plaintiff also reported to Dr. Wallen in January 2009 that

8    he played the guitar.  (AR 498.)  Plaintiff does not argue that

9    Dr. Sherrill's or Dr. Wallen's descriptions of his daily

10   activities were inaccurate in any way.  Plaintiff also testified

11   that he was able to drive several times a week and regularly met

12   with administrators at his daughter's school to review her

13   education plan.  (AR 56-58.)  That Plaintiff's allegations of

14   disabling pain were inconsistent with evidence in the record as

15   to his daily activities was a valid reason for the ALJ to

16   discount his testimony.  See Bray v. Comm'r of Soc. Sec. Admin.,

17   554 F.3d 1219, 1227 (9th Cir. 2009) (ALJ properly discounted

18   claimant's testimony because "she leads an active lifestyle,

19   including cleaning, cooking, walking her dogs, and driving to

20   appointments"); Berry, 622 F.3d at 1234-35 (holding that when

21   claimant "told medical staff he engaged in daily walks of a mile

22   or more, had various social engagements, drove his car and did

23   crossword puzzles, computer work, pet care, cooking, laundry and

24   other house-keeping," ALJ properly discounted claimant's

25   credibility based on "inconsistencies in [claimant's] reported

26   symptoms and activities"); Molina, 674 F.3d at 1113 ("Even where

27   [claimant's] activities suggest some difficulty functioning, they

28   may be grounds for discrediting the claimant's testimony to the

                                   37

1  extent that they contradict claims of a totally debilitating
2  impairment.").

3      Because the ALJ gave clear and convincing reasons for his
4  credibility finding and those reasons were supported by
5  substantial evidence, the Court "may not engage in
6  second-guessing." Thomas, 278 F.3d at 959 (citation omitted).
7  Plaintiff is not entitled to reversal on this claim.

8      C.  The ALJ Did Not Err in Determining Plaintiff's RFC
9      In issues four and five, Plaintiff contends that the ALJ
10 erred in determining that he retained the RFC to perform light
11 work and could perform his past relevant work. (J. Stip. at 17-
12 22). Reversal is not warranted on these bases.

13     A district court must uphold an ALJ's RFC assessment when
14 the ALJ has applied the proper legal standard and substantial
15 evidence in the record as a whole supports the decision.
16 Bayliss, 427 F.3d at 1217. The ALJ must have considered all the
17 medical evidence in the record and "explain in [his or her]
18 decision the weight given to . . . [the] opinions from treating
19 sources, nontreating sources, and other nonexamining sources."
20 20 C.F.R. § 404.1527(e)(2)(ii). In making an RFC determination,
21 the ALJ may consider those limitations for which there is support
22 in the record and need not consider properly rejected evidence or
23 subjective complaints. See Batson, 359 F.3d at 1197-98 ("ALJ was
24 not required to incorporate evidence from the opinions of
25 [plaintiff's] treating physicians, which were permissibly
26 discounted"); Bayliss, 427 F.3d at 1217 (upholding ALJ's RFC
27 determination because "the ALJ took into account those
28 limitations for which there was record support that did not

depend on [claimant's] subjective complaints"). The Court must consider the ALJ's decision in the context of "the entire record as a whole," and if the "evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) (internal quotation marks omitted).

Plaintiff argues, without elaborating, that the ALJ's RFC finding was in error because it did not account for Plaintiff's alleged depression, anxiety, or "physical pain." (J. Stip. at 18, 20-22.) It is Plaintiff's burden at step four to prove that he is unable to perform past relevant work. Drouin, 966 F.2d at 1257. Plaintiff's conclusory arguments without citation to the record are insufficient to meet his burden. See Carmickle, 533 F.3d at 1161 n.2 (rejecting argument when claimant "failed to argue [it] with any specificity in his briefing"); see also Rogal v. Astrue, No. C12-5158-RSL-BAT, 2012 WL 7141260, at *3 (W.D. Wash. Dec. 7, 2012) ("It is not enough merely to present an argument in the skimpiest way, and leave the Court to do counsel's work - framing the argument and putting flesh on its bones through a discussion of the applicable law and facts."), accepted by 2013 WL 557172 (W.D. Wash. Feb. 12, 2013). As discussed in Section V.A above, the ALJ's evaluation of Plaintiff's impairments was supported by substantial evidence in the record. The consulting examiner also found that Plaintiff was capable of doing light work. (AR 403.) Plaintiff has not met his burden to show that that finding was in error.

Plaintiff argues that the ALJ's hypothetical to the VE was improper because it "did not contain a true function-by-function

assessment of the plaintiff's limitations." (J. Stip. at 19.) Plaintiff does not identify the specific functions that the ALJ failed to include in the hypothetical, but to the extent he argues that the ALJ should have included additional limitations that were found to be not credible or not supported by the record, the ALJ did not err. See Bayliss, 427 F.3d at 1217 (holding that "[p]reparing a function-by-function analysis for medical conditions or impairments that the ALJ found neither credible nor supported by the record is unnecessary" and that ALJ may rely on VE response to hypothetical that "contained all of the limitations that the ALJ found credible and supported by substantial evidence in the record").

Plaintiff also argues that the hypothetical was "lacking" because it did not take into account new medical evidence, in particular the evidence from the Mayo Clinic. (J. Stip. at 19, AR 72.) As detailed above, however, the Mayo Clinic evidence was consistent with the other evidence of record demonstrating that Plaintiff's test results did not show any significant abnormalities and doctors could not find an explanation for Plaintiff's headaches. (See AR 616, 619, 628.) Moreover, as discussed above, to the extent Dr. Dhaliwal's statement that Plaintiff's headaches were "debilitating" was meant to evaluate his medical condition, the ALJ properly rejected it. Reversal is not warranted on this basis.

## VI.   CONCLUSION

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[15] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.   IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.

DATED: May 22, 2013

_____
JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[15]   This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."