O

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

BRUCE W. ALBERTSON, JR.,      ) Case No. CV 12-2508-JPR
                             )
              Plaintiff,     )
                             )
         vs.                 ) MEMORANDUM OPINION AND ORDER
                             ) AFFIRMING THE COMMISSIONER
CAROLYN W. COLVIN, Acting     )
Commissioner of Social        )
Security,[1]                  )
                             )
              Defendant.      )
                             )

I.    **PROCEEDINGS**

    Plaintiff seeks review of the Commissioner's final decision
denying his application for Social Security disability insurance
benefits ("DIB").  The parties consented to the jurisdiction of
the undersigned U.S. Magistrate Judge pursuant to 28 U.S.C.
§ 636(c).  This matter is before the Court on the parties' Joint
Stipulation, filed November 29, 2012, which the Court has taken
under submission without oral argument.  For the reasons stated

_____

    [1]    On February 14, 2013, Colvin became the Acting
Commissioner of Social Security.  Pursuant to Federal Rule of
Civil Procedure 25(d), the Court therefore substitutes Colvin for
Michael J. Astrue as the proper Respondent.

below, the Commissioner's decision is affirmed and this action is dismissed.

**II.   BACKGROUND**

Plaintiff was born on February 6, 1970.  (Administrative Record ("AR") 134.)  He has a high school education and vocational training as an automobile salesperson.  (AR 46-47, 170.)   He previously worked as a salesperson and general manager for car dealerships.  (AR 48, 166.)

On November 25, 2009, Plaintiff filed an application for DIB.  (AR 134, 161.)  Plaintiff alleged that he had been unable to work since January 1, 2009, because of "Hypertensive Heart Disease, Diabetes, Hypercholesterolemia, Palpitations, Myocarditis, [and] Temp[o]ral A[r]teritis."[2]  (AR 165.)  His application was denied initially, on February 17, 2010, and upon reconsideration, on April 16, 2010.  (AR 78-83.)

On April 22, 2010, Plaintiff requested a hearing before an ALJ.  (AR 84-85.)  A hearing was held on January 10, 2011, at which Plaintiff, who was represented by counsel, appeared and testified; a vocational expert ("VE") also testified.  (AR 41-

---

[2]     Hypercholesterolemia is a condition characterized by very high levels of cholesterol in the blood. Hypercholesterolemia, Genetics Home Reference, http://ghr.nlm.nih.gov/condition/hypercholesterolemia (last updated May 6, 2013).  Myocarditis is an inflammation of the heart muscle and is an "uncommon disorder" usually caused by viral, bacterial, or fungal infections that reach the heart. Myocarditis, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ ency/article/000149.htm (last updated Mar. 22, 2013).  Temporal arteritis is a disorder causing inflammation and damage to the blood vessels that supply the head and neck.  See Temporal arteritis, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ ency/article/000448.htm (last updated Jan. 26, 2011).

73.)  In a written decision issued on January 28, 2011, the ALJ determined that Plaintiff was not disabled.  (AR 16-29.)  On February 9, 2011, Plaintiff requested review of the ALJ's decision and submitted additional medical evidence for the Appeals Council to review.  (AR 9, 15.)  On January 25, 2012, the Appeals Council considered the additional evidence but denied Plaintiff's request for review.  (AR 5-9.)  This action followed.

**III. STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. § 405(g); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than a scintilla but less than a preponderance.  Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1996).  "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner.  Id. at 720-21.

3

**IV.   THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted, or is expected to last, for a continuous period of at least 12 months.  42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

A.   The Five-Step Evaluation Process

The ALJ follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied.  § 404.1520(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied.  § 404.1520(a)(4)(ii).  If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., pt. 404, subpt. P, app. 1; if so, disability is conclusively presumed and benefits are awarded.

4

§ 404.1520(a)(4)(iii).  If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[3] to perform his past work; if so, the claimant is not disabled and the claim must be denied.

§ 404.1520(a)(4)(iv).  The claimant has the burden of proving that he is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets that burden, a prima facie case of disability is established.  Id.  If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy.  § 404.1520(a)(4)(v).  That determination comprises the fifth and final step in the sequential analysis.  § 404.1520; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

      B.   The ALJ's Application of the Five-Step Process

     At step one, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since January 1, 2009.  (AR 21.)  At step two, the ALJ concluded that Plaintiff had the severe impairments of "chronic headaches and diabetes mellitus."  (Id.)  At step three, the ALJ determined that Plaintiff's impairments did not meet or equal any of the impairments in the Listing, but he specifically focused on Listings 1.00 (musculoskeletal system)

---

      [3]   RFC is what a claimant can still do despite existing exertional and nonexertional limitations.  20 C.F.R. § 404.1545; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

and 9.08 (endocrine disorders - diabetes mellitus).[4]  (AR 23.)
At step four, the ALJ found that Plaintiff retained the RFC to
perform the full range of light work.[5]  (Id.)  Based on the VE's
testimony, the ALJ concluded that Plaintiff was able to perform
his past relevant work as an automobile salesperson and manager.
(AR 25.)  At step five, the ALJ concluded that Plaintiff was not
disabled.  (AR 25-26.)

**V.  DISCUSSION**

     Plaintiff alleges that the ALJ erred in doing the following:
(1) failing to find that Plaintiff had additional severe
impairments; (2) evaluating the medical evidence of Plaintiff's
visit to the Mayo Clinic in January 2010; (3) assessing
Plaintiff's credibility; (4) determining that Plaintiff could
perform his past relevant work; and (5) evaluating Plaintiff's
RFC.  (J. Stip. at 2.)  None of these contentions warrant

---

     [4]     Listing 9.08 was deleted effective June 7, 2011.  See
Listing of Impairments - Adult Listings (Part A),
http://www.ssa.gov/disability/professionals/bluebook/AdultListing
s.htm (last updated Apr. 10, 2013).  Impairments resulting from
endocrine disorders such as diabetes are now evaluated under the
listings for other body systems.  See 20 C.F.R. § 404, subpt. P,
app. 1, § 9.00B.

     [5]     "Light work" is defined as involving "lifting no more
than 20 pounds at a time with frequent lifting or carrying of
objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).  The
regulations further specify that "[e]ven though the weight lifted
may be very little, a job is in this category when it requires a
good deal of walking or standing, or when it involves sitting
most of the time with some pushing and pulling of arm or leg
controls."  Id.  A person capable of light work is also capable
of "sedentary work," which involves lifting "no more than 10
pounds at a time and occasionally lifting or carrying [small
articles]" and may involve occasional walking or standing.
§ 404.1567(a)-(b).

6

1  reversal.

2      A.   The ALJ Properly Evaluated the Medical Evidence

3      Plaintiff contends that the ALJ failed to properly consider

4  Plaintiff's additional impairments of "anxiety, asthma,

5  depression, hypertension, cardiac condition, polymyalgia

6  rheumatic,[6] [and] vascular abnormality, right temple area." (J.

7  Stip. at 3-4, 7-9.)  He further contends that the ALJ failed to

8  consider evidence from the Mayo Clinic that he was diagnosed with

9  "debilitating" "New Persistent Daily Headache" syndrome, and he

10 argues that the ALJ erred in failing to consider additional

11 impairments in the Listings.  (Id.)  Remand is not warranted on

12 any of these bases, however, because the ALJ provided legally

13 sufficient reasons for his evaluation of the medical evidence.

14      1.   Severity of additional impairments

15     Plaintiff first contends that the ALJ erred in finding that

16 his additional impairments were nonsevere or by failing to

17 address them altogether.  (J. Stip. at 3-4, 7-9.)

18     At step two of the sequential evaluation process, a

19 plaintiff has the burden to present evidence of medical signs,

20 symptoms, and laboratory findings that establish a medically

21 determinable physical or mental impairment that is severe and can

22 be expected to result in death or last for a continuous period of

23

24     [6]   Polymyalgia rheumatica is a condition that causes
25 muscle pain and stiffness in the neck, shoulders, and hips.  It
   sometimes occurs along with giant cell ateritis, a condition that
26 causes swelling of the arteries in the head.  It responds well to
   treatment; without treatment it will nonetheless generally go
27 away within a year or more.  See Polymyalgia Rheumatica,
   MedlinePlus, http://www.nlm.nih.gov/medlineplus/
28 polymyalgiarheumatica.html (last updated Apr. 10, 2013).

7

at least 12 months.  Ukolov v. Barnhart, 420 F.3d 1002, 1004-05 (9th Cir. 2005) (citing 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D));[7] see 20 C.F.R. §§ 404.1520, 404.1509.  Substantial evidence supports an ALJ's determination at step two that an impairment is not severe when "there are no medical signs or laboratory findings to substantiate the existence of a medically determinable physical or mental impairment."  Ukolov, 420 F.3d at 1004-05 (citing SSR 96-4p).  An impairment may never be found on the basis of the claimant's subjective symptoms alone.  Id. at 1005.

Step two is "a de minimis screening device [used] to dispose of groundless claims."  Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996).  Applying the applicable standard of review to the requirements of step two, a court must determine whether an ALJ had substantial evidence to find that the medical evidence clearly established that the claimant did not have a medically severe impairment or combination of impairments.  Webb v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2005); see also Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir. 1988) ("Despite the deference usually accorded to the Secretary's application of regulations, numerous appellate courts have imposed a narrow construction upon the severity regulation applied here.").  An impairment or combination of impairments is "not severe" if the evidence established only a slight abnormality that had "no more than a

_____

[7]    A "medical sign" is "an anatomical, physiological, or psychological abnormality that can be shown by medically acceptable clinical diagnostic techniques."  Ukolov, 420 F.3d at 1005.

minimal effect on an individual's ability to work." <u>Webb</u>, 433
F.3d at 686 (citation omitted).

The ALJ found, based on substantial evidence in the record,
that Plaintiff's impairments of "hypertension, arthritis and a
chronic cough" were "nonsevere impairments that respond easily to
treatment." (AR 22.) He noted that a November 30, 2010 physical
examination "failed to show any significant problems" relating to
those impairments; Plaintiff's blood pressure and heart
examination were normal, there were no signs of hypertensive end
organ damage, and the examining doctor noted that Plaintiff's
cough was likely a side effect of medication he was taking and
therefore changed the medication. (AR 22, 660.) The ALJ noted
that evidence in the record showed that Plaintiff had normal
blood-pressure readings and mostly normal cardiac test results,
with only "slight" abnormalities in Plaintiff's temporal artery.
(AR 22, 567-68, 636, 639.)

With respect to Plaintiff's alleged arthritis, the ALJ
found, consistent with substantial evidence in the record, that
it was nonsevere, noting that a September 25, 2008 MRI of
Plaintiff's right hand showed only mild osteoarthritis of the
first carpometacarpal joint and minimal degenerative cyst
formation in the second metacarpal head. (AR 22, 498, 564-65.)
Tests and examinations performed in January and December 2009
showed no evidence of rheumatoid or inflammatory arthritis, and
treatment for Plaintiff's hand pain was limited to conservative
measures, such as "paraffin, analgesics, and not overusing the
hand." (AR 22, 498, 520.)

The ALJ also found, based on substantial evidence, that

9

Plaintiff's alleged depression and anxiety were nonsevere.  He
noted that the record did not contain any credible evidence of
limitations in activities of daily living or social interactions,
showed "only mild limitations in concentration, persistence or
pace," and contained no evidence that Plaintiff underwent any
episodes of decompensation.  (AR 22.)  Specifically, the ALJ
noted that consultative examining psychologist Dr. Lou Ellen
Sherrill's March 26, 2010 report found no signs of cognitive
dysfunction, memory problems, thought disturbances, impaired
processing or functioning, or IQ impairments.  (AR 22, 588-93.)
He noted that Dr. Sherrill's functional assessment limited
Plaintiff to performing simple to moderately complex tasks, but
her observation that Plaintiff would have "severe difficulty
tolerating ordinary work pressure and difficulty interacting with
others" was not supported by the record.  (AR 22, 593.)  The ALJ
noted that endocrinologist Dr. Etie Moghissi's progress notes
observed that Plaintiff never had problems understanding
instructions, and no doctor had ever reported that Plaintiff had
memory deficits or difficulty interacting with others.  (AR 22,
407-587, 661-75.)  He also noted that in April 2010, the state
agency medical consultant concluded that Plaintiff's depression
and anxiety were nonsevere, which was consistent with the
objective results of Dr. Sherrill's consultative examination and
the remainder of the record.  (AR 22, 596-601.)

     Plaintiff argues that the ALJ erred in failing to credit Dr.
Sherrill's statements that Plaintiff "has numerous symptoms of
depression that are totally associated with his medical
condition" and would have "severe difficulty tolerating ordinary

1  work pressures[,] severe difficulty interacting satisfactorily
2  with others in the workplace, including the general public," and
3  "severe difficulty observing basic work and safety standards in
4  the workplace without difficulty." (J. Stip. at 8; see AR 591,
5  593.) An ALJ is not bound by the findings and other opinions of
6  state-agency psychological consultants. 20 C.F.R.
7  § 404.1527(e)(2)(i). The ALJ properly cited substantial evidence
8  in the record showing that, despite Dr. Sherrill's comments,
9  Plaintiff's mental impairment was not severe. (See AR 350, 489-
10 90, 588-93, 661-75.) Moreover, Dr. Sherrill's opinion was
11 inconsistent with her examination results, and the ALJ therefore
12 did not err in rejecting it. See Allen v. Comm'r of Soc. Sec.,
13 498 F. App'x 696, 697 (9th Cir. 2012) (ALJ did not err in
14 rejecting consulting psychologist's opinion when "ALJ found
15 evidence in the record indicating that [claimant's] mental
16 impairment was not severe"); cf. Connett v. Barnhart, 340 F.3d
17 871, 875 (9th Cir. 2003) (treating doctor's opinion properly
18 rejected when treatment notes "provide no basis for the
19 functional restrictions he opined should be imposed on
20 [claimant]"); Valentine v. Comm'r, Soc. Sec. Admin., 574 F.3d
21 685, 692-93 (9th Cir. 2009) (contradiction between treating
22 physician's opinion and his treatment notes constitutes specific
23 and legitimate reason for rejecting treating physician's
24 opinion).

25      Plaintiff also argues that he saw treating physician Dr.
26 Roland Wallen in November 2006 for "discussion of his severe
27 anxiety syndrome and stomach pain and his recent hospitalization
28 for diagnosis and chest pain," which he cites as evidence that

his anxiety and depression were severe.  (J. Stip. at 8; AR 260.)
Dr. Wallen noted at that time that Plaintiff's "[a]nxiety
syndrome" was "from business issues and family issues" and
prescribed him Klonopin[8] "as needed for his management of
anxiety."  (AR 260.)  Dr. Wallen also noted that Plaintiff's
cardiac test results were "perfectly normal," he showed no signs
of arrhythmia or other heart conditions, and his "hypertension
and diabetes type II" were "under control."  (Id.)  But as the
ALJ properly found, substantial evidence in the record showed
that Plaintiff's mental functioning was normal and that he had no
difficulty interacting with others or performing various daily
activities.  (AR 22; see AR 588-93, 661-75.)  Indeed, in June
2008, nearly two years after the notes Plaintiff relies on, Dr.
Wallen found that Plaintiff's "mental status" was "[a]lert,
normal," Plaintiff "[a]nswers all questions appropriately," he
had "[n]o severe depression or suicidal ideation," and his other
vital signs were also normal.  (AR 350.)  The ALJ's finding that
Plaintiff's depression and anxiety were nonsevere was consistent
with the record.  (See also, e.g., AR 489-90 (noting in August
2009 that Plaintiff "reports . . . that his mood has been
unaffected," "does appear in good spirits," was "very pleasant,"
and reported "[n]o feeling depressed").)

     Although evidence in the record shows that Plaintiff likely
suffered from some degree of hypertension, cough, cardiac

---

     [8]     Klonopin, also known as Clonazepam, is a medication
that decreases abnormal electrical activity in the brain and is
used to relieve panic attacks, among other uses.  Clonazepam,
MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/
meds/a682279.html (last updated May 2, 2013).

condition, arthritis, depression, and anxiety, Plaintiff has not
pointed to any evidence in the record that those impairments
significantly limited his ability to work.  See 20 C.F.R.
§ 404.1520(c) (severe impairment is one that "significantly
limits [claimant's] physical or mental ability to do basic work
activities").  Thus, Plaintiff has not met his burden to present
evidence of medical signs, symptoms, and laboratory findings
establishing that those conditions were severe.  Indeed,
Plaintiff admitted that he did not see a mental-health
professional for his depression or anxiety and that he treated
those conditions with anti-anxiety medicine prescribed by his
primary-care physician, which further indicates that his
depression and anxiety were not severe.[9]  (AR 51.)  He also
admitted that he did not see his cardiologist on a regular basis,
indicating that his "cardiac condition" was also not severe.
(Id.)  To the extent he claims he had asthma, Plaintiff does not
cite to any objective evidence in the record confirming that
diagnosis; a CT scan of Plaintiff's lungs in April 2007 showed no

---

[9]     Failure to seek mental-health treatment may not be a
valid reason for rejecting a claimant's mental-health claims.
See Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996)
(holding that although a claimant "may have failed to seek
psychiatric treatment for his mental condition, it is a
questionable practice to chastise one with a mental impairment
for the exercise of poor judgment in seeking rehabilitation")
(internal quotation marks and citation omitted).  To the extent
the ALJ relied on that as evidence that Plaintiff's mental
impairment was not severe, however, any error was harmless
because the vast weight of the evidence in the record supports
the ALJ's finding that Plaintiff's mental impairment was not
severe.  See Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050,
1055 (9th Cir. 2006) (ALJ's error harmless when "inconsequential
to the ultimate nondisability determination").

1  evidence of lung disease.  (AR 580-81.)  Moreover, in November

2  2010 Plaintiff's new primary-care physician, Dr. Navid Hakimian,

3  noted that Plaintiff had "[n]o history of asthma."  (AR 660.)

4  Accordingly, Plaintiff did not carry his burden at step two of

5  the analysis to show that the other impairments of which he

6  complains were severe.

7        In any event, even if the ALJ erred by finding the

8  additional impairments nonsevere, that error was harmless because

9  he considered all of Plaintiff's impairments, both severe and

10 nonsevere, when determining his RFC at step four.  See Lewis v.

11 Astrue, 498 F.3d 909, 911 (9th Cir. 2007) (failure to address

12 particular impairment at step two harmless if ALJ fully evaluates

13 claimant's medical condition in later steps of sequential

14 evaluation process); see also Stout v. Comm'r, Soc. Sec. Admin.,

15 454 F.3d 1050, 1055 (9th Cir. 2006) (ALJ's error harmless when

16 "inconsequential to the ultimate nondisability determination").

17 Specifically, the ALJ analyzed Plaintiff's claims of depression

18 and anxiety, joint pain, stiffness, and problems with gait at

19 step four and concluded, consistent with the record, that they

20 did not affect his ability to perform light work.  (AR 24-25.)

21       With respect to Plaintiff's alleged polymyalgia rheumatica

22 and right-temple vascular abnormality, the ALJ properly accounted

23 for those conditions in finding that Plaintiff's headaches were a

24 severe impairment.  The ALJ noted, consistent with the record,

25 that Plaintiff had swelling in the right side of the forehead and

26 chronic headaches but that his neurological examinations revealed

27 only mild abnormalities.  (AR 21; see AR 351-52, 393, 409-14,

28 420-22, 488-95, 579, 627-28.)  Plaintiff notes that evidence in

14

the record showed he had symptoms associated with these conditions (J. Stip. at 3), but he fails to explain how the ALJ's evaluation of the severity of Plaintiff's symptoms was inconsistent with the record as a whole.  Plaintiff is thus not entitled to remand on this ground.  See Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005) (quoting Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999) ("The claimant bears the burden of proving that she is disabled.")).

### 2.  Mayo Clinic evidence

Plaintiff next contends that the ALJ erred in failing to consider evidence from the Mayo Clinic that Plaintiff suffered from New Persistent Daily Headache, a "debilitating" condition. (J. Stip. at 4, 9.)  As explained below, the ALJ properly considered the Mayo Clinic evidence as well as other evidence in the record regarding Plaintiff's chronic headaches, and reversal is therefore not warranted on this basis.

#### a.  *Applicable law*

Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant (non-examining physicians)."  Lester, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a nonexamining physician.  Id.

The opinions of treating physicians are generally afforded

more weight than the opinions of nontreating physicians because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant. Smolen, 80 F.3d at 1285. If a treating physician's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight. 20 C.F.R. § 404.1527(c)(2). If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's area of specialization, and other factors. 20 C.F.R. § 404.1527(c)(2)-(6).

When a treating or examining doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons. Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008) (quoting Lester, 81 F.3d at 830-31). When a treating or examining physician's opinion conflicts with another doctor's, the ALJ must provide only "specific and legitimate reasons" for discounting the treating doctor's opinion. Id. Further, the ALJ "need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); accord Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004). The weight given an examining physician's opinion, moreover, depends on whether it is

consistent with the record and accompanied by adequate

explanation, among other things.   20 C.F.R. § 404.1527(c)(3)-(6).

          b.   *Relevant facts*

     On October 24, 2007, Plaintiff saw Dr. Wallen after visiting

the emergency room two days prior for "sudden swelling in the

forehead the size of a golf ball with severe pain."   (AR 587.)

Dr. Wallen noted that the right side of Plaintiff's forehead

showed "some elevation" and "some tenderness and soft swelling,

non-throbbing but it is tender," but all of Plaintiff's vital

signs and other examination results were normal.   (<u>Id.</u>)  He

referred Plaintiff for an MRA[10] and further testing.   (<u>Id.</u>)

     On October 30, 2007, Plaintiff underwent MRI and MRA

examinations of his brain, head, and neck.   (AR 576-79.)   The

exams revealed no significant abnormalities.   (<u>Id.</u>)  On December

17, 2007, Plaintiff underwent another MRA of his neck, which

showed that his arteries were normal.   (AR 575.)   On March 6,

2008, Plaintiff had an MRI of his brain, which revealed "a minute

mucus retention cyst in the base of the right maxillary sinus";

all other results were normal.   (AR 573-74.)   It was noted that

there was "no abnormality of the right frontal scalp or cranium."

(AR 574.)   On March 25, 2008, Plaintiff underwent a scan of a

"bump" on his right frontal scalp.   (AR 571-72.)   It showed no

aneurysms or vascular malformations, and Plaintiff's

"intracranial vascular anatomy" was noted as "essentially

_____

     [10]   A Magnetic Resonance Angiogram ("MRA") is a type of MRI
scan that uses a magnetic field and pulses of radio wave energy
to provide pictures of blood vessels.   <u>Magnetic Resonance
Angiogram (MRA)</u>, WebMD, http://www.webmd.com/heart-disease/
magnetic-resonance-angiogram-mra (last updated June 30, 2010).

normal." (AR 571.)  On April 23, 2008, Plaintiff had an ultrasound evaluation of his scalp in the right frontal area. (AR 570.)  It revealed "normal appearance of subgaleal soft tissues" and "[n]o significant abnormal vascularity." (Id.)

On June 27, 2008, Dr. Wallen referred Plaintiff to surgery at Saint John's Health Center in Santa Monica to remove a "vascular abnormality" from his "right temple area which appeared initially like temporal arteritis until an angiogram was performed." (AR 349.)  On July 9, 2008, Plaintiff had the mass on his right scalp and forehead surgically removed; a biopsy was also performed on the mass. (AR 351.)  The surgeon noted that Plaintiff felt that the mass "is significantly contributing towards the pain" in his head, but the doctor was "somewhat leery of this diagnosis" because he did not "feel that biopsy of this will likely affect [Plaintiff's] pain symptoms in a significant manner." (Id.)  The biopsy showed that the veins in the mass had "reactive endothelial changes and mild intimal fibrosis," but the mass was not malignant. (AR 393.)

On December 3, 2008, Plaintiff saw Dr. Alexander Hersel for an occipital nerve block to relieve his headaches. (AR 505-06.) Dr. Hersel performed the procedure and noted that Plaintiff tolerated it well and "stated that he had significant reduction in the radiating pain above the scalp to the eye as well as the hyperalgesia overlying the skin of the scalp." (AR 506.)

On August 4, 2009, Plaintiff was referred by Dr. Wallen to Dr. Talin Evazyan at UCLA Medical Center. (AR 488.)  Dr. Evazyan recounted Plaintiff's medical history of headaches, beginning in October 2007; he noted that Plaintiff's past neurological test

18

results were generally normal and Plaintiff's headaches continued after biopsy of his temporal artery. (Id.) Dr. Evazyan diagnosed Plaintiff with "a neuroma"[11] and recommended "local infiltration of the site," "lidocaine patches" for "symptomatic relief," Voltaren gel for local pain relief, and supratrochlear and supraorbital nerve blocks. (AR 490.) He also noted that Plaintiff "might even benefit from a visit to Mayo Clinic where a specialist can offer a more definite diagnosis for him." (Id.)

On January 4, 2010, Plaintiff visited the Mayo Clinic, where he had MRI exams of his face, head, and neck. (AR 616.) They revealed "[n]o evidence of a right frontal subcutaneous vascular malformation." (Id.) On January 5, 2010, Plaintiff saw Dr. Jaspreet K. Dhaliwal at the Mayo Clinic. (AR 627-29.) Dr. Dhaliwal recounted Plaintiff's history of headaches since October 2007 and his description of his subjective symptoms, noting that Plaintiff rated his "constant headache" "a 4/10 in severity" but "[t]hree to four times per week, he will notice enlargement of the right forehead lesion, and his pain will increase to a 10/10 in severity." (AR 627.) Dr. Dhaliwal performed a physical examination of Plaintiff and noted that Plaintiff had "some slight asymmetry about the size of a quarter on the right forehead just above the lateral aspect of his eyebrow" that was "soft and nonpulsatile in nature," but all other signs were normal. (AR 628.) He then made the following notes regarding

---

[11] A neuroma is a benign tumor that arises from a nerve. Neuroma definition, eMedicineHealth, http://www.emedicinehealth.com/script/main/art.asp?articlekey=4554 (last visited May 10, 2013).

his treatment plan for Plaintiff:

> Mr. Albertson gives a history of a pulsatile forehead lesion and headaches, which is suspicious for a vascular malformation.  In reviewing his MRI, I do not see anything obvious for that.  He is experiencing chronic daily headaches, which are debilitating.  I would appreciate input from our neurologists.  Given the fact that the patient has had surgery since his March 2008 MRI scan, I will repeat an MRI and compare it to his previous scan.  I will also request his slides from his temporal artery biopsy.  I do not feel this is consistent with temporal arteritis, and I also am having some difficulty attributing to [sic] the magnitude of his symptoms to his forehead lesion.  I will see him back following the neurology evaluation and MRI.

(AR 628.)

On January 7, 2010, Plaintiff returned to the Mayo Clinic for a follow-up visit with Dr. Dhaliwal.  (AR 619-24.)  Dr. Dhaliwal reported that Plaintiff's MRI "does not demonstrate any focal acute abnormality to account for his headaches" and agreed with past assessments that Plaintiff suffered from "chronic daily headache and the forehead asymmetry is likely unrelated."  (AR 619.)

### c.   *Analysis*

The ALJ cited the Mayo Clinic reports in his written decision when noting that Plaintiff "reports a history of a mass on the right side of the forehead and chronic headaches since October 2007."  (AR 21 (citing AR 627).)  Consistent with Dr.

Dhaliwal's evaluation, he then recounted the MRI results and physician's reports from 2008 and 2009 showing no significant abnormalities, no connection between the mass on Plaintiff's forehead and his headaches, and no other explanation for Plaintiff's headaches.  (AR 21 (citing AR 614-28).)  He also cited the Mayo Clinic reports in noting that Plaintiff's daily activities and social interactions were not impaired by his mental or physical conditions.  (AR 24 (citing AR 614-28 (showing that Plaintiff did not report impairment in activity or social interactions)).)

The ALJ's opinion was consistent with the evidence from the Mayo Clinic.  As the ALJ noted, Plaintiff's MRI results revealed no significant abnormalities (AR 616), and Plaintiff's headaches appeared unrelated to the mass on his forehead (AR 619).  Like the other evidence that the ALJ discussed in more detail, the records from the Mayo Clinic ultimately show that despite extensive testing, doctors could not find an explanation for Plaintiff's headaches.  (See AR 619, 628.)  Dr. Dhaliwal even expressed some skepticism concerning Plaintiff's subjective symptoms, stating that he was "having some difficulty attributing to [sic] the magnitude of [Plaintiff's] symptoms to his forehead lesion" and expressing doubt that Plaintiff's headaches were attributable to a vascular malformation or temporal arteritis, as Plaintiff appears to have claimed.  (See AR 628.)

Plaintiff argues that the ALJ erred in failing to credit Dr. Dhaliwal's characterization of his headaches as "debilitating" and failing to note a diagnosis of "New Persistent Daily Headache."  (J. Stip. at 4.)  These contentions do not warrant

21

1  reversal.  Dr. Dhaliwal's use of the word "debilitating" appears

2  to reference Plaintiff's own description of his symptoms.  (See

3  AR 628.)  In any event, as discussed below, the ALJ properly

4  discounted Plaintiff's credibility, and thus he did not need to

5  credit any medical opinions based on Plaintiff's subjective

6  complaints.  See Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th

7  Cir. 2001) (when ALJ properly discounted claimant's credibility,

8  he was "free to disregard" doctor's opinion that was premised on

9  claimant's subjective complaints); Morgan v. Comm'r of Soc. Sec.

10 Admin., 169 F.3d 595, 602 (9th Cir. 1999) (when physician's

11 opinion of disability premised "to a large extent" upon

12 claimant's own accounts of symptoms, limitations may be

13 disregarded if complaints have been "properly discounted").

14 Moreover, to the extent Dr. Dhaliwal's characterization of

15 Plaintiff's headaches as "debilitating" was intended to be an

16 evaluation of Plaintiff's ability to work, the ALJ was free to

17 disregard it.  See 20 C.F.R. § 404.1545(e); SSR 96-5p, 1996 WL

18 374183, at *5 (Commissioner must make ultimate disability

19 determination; opinions from medical sources about whether a

20 claimant is "disabled" or "unable to work" "can never be entitled

21 to controlling weight or given special significance"); McLeod v.

22 Astrue, 640 F.3d 881, 885 (9th Cir. 2011) (noting that "a

23 treating physician ordinarily does not consult a vocational

24 expert or have the expertise of one"; treating physician's

25 evaluation of claimant's ability to work thus not entitled to

26 deference because "[t]he law reserves the disability

27 determination to the Commissioner").

28     Regarding the diagnosis of "New Persistent Daily Headache,"

Plaintiff fails to explain how that term carries a different meaning than "chronic headaches," the term the ALJ used to describe Plaintiff's condition.  Indeed, although Dr. Dhaliwal described Plaintiff's condition as "New Persistent Daily Headache" on one page of his notes (AR 623), on several other pages he refers to it as simply "headaches" or "chronic daily headaches" (AR 619-20, 627, 628).  Plaintiff even used the two terms interchangeably in his testimony.  (<u>See</u> AR 60.)

Plaintiff has failed to show how the ALJ's decision was inconsistent with the record.  His contentions therefore do not warrant reversal.

### 3.   <u>Application of Listings</u>

Plaintiff also argues that the ALJ improperly failed to consider Listings 4.00 <u>et seq.</u> and 12.06 in determining that Plaintiff's impairments did not meet or equal a listed impairment.  (J. Stip. at 7.)  Reversal is not warranted on this basis.

Listed impairments are those that are "so severe that they are irrebuttably presumed disabling, without any specific finding as to the claimant's ability to perform his past relevant work or any other jobs."  <u>Lester</u>, 81 F.3d at 828.  A step-three finding of disability must be based on medical evidence from acceptable medical sources only, i.e., licensed psychologists or physicians designated by the Commissioner.  20 C.F.R. §§ 404.1529(d)(3), 404.1526(c), (d).  The claimant has the initial burden to prove an impairment under an identified Listing.  <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530-33, 110 S. Ct. 885, 891-92, 107 L. Ed. 2d 967 (1990).

1    An ALJ's decision that a plaintiff did not meet a Listing
2  must be upheld if it was supported by "substantial evidence."
3  See Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th
4  Cir. 2006).  Substantial evidence is "more than a mere scintilla
5  but less than a preponderance; it is such relevant evidence as a
6  reasonable mind might accept as adequate to support a
7  conclusion."  Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir.
8  1997).  When evidence was susceptible to more than one rational
9  interpretation, the Court must uphold the ALJ's conclusion as
10 long as substantial evidence existed to support it.  Id.

11    An ALJ "must evaluate the relevant evidence before
12 concluding that a claimant's impairments do not meet or equal a
13 listed impairment."  Lewis v. Apfel, 236 F.3d 503, 512 (9th Cir.
14 2001).  The ALJ, however, need not "state why a claimant failed
15 to satisfy every different section of the listing of
16 impairments."  Gonzalez v. Sullivan, 914 F.2d 1197, 1201 (9th
17 Cir. 1990) (finding ALJ did not err in failing to state what
18 evidence supported conclusion that, or discuss why, claimant's
19 impairments did not satisfy a Listing).  Moreover, the ALJ "is
20 not required to discuss the combined effects of a claimant's
21 impairments or compare them to any listing in an equivalency
22 determination, unless the claimant presents evidence in an effort
23 to establish equivalence."  Burch v. Barnhart, 400 F.3d 676, 683
24 (9th Cir. 2005) (citing Lewis, 236 F.3d at 514).

25    As an initial matter, Plaintiff has not presented any
26 evidence that he argued to the ALJ that his impairments met or
27 equaled Listings 4.00 et seq. or 12.06.  "It is unnecessary to
28 require the Secretary, as a matter of law, to state why a

claimant failed to satisfy every different section of the listing of impairments." Gonzalez, 914 F.2d at 1201. The ALJ did not err in failing to consider listings that Plaintiff never identified were at issue. Burch, 400 F.3d at 683 ("An ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence."); Bowman v. Astrue, 2011 WL 3323383, at *4 (C.D. Cal. Aug. 2, 2011) (rejecting plaintiff's argument that ALJ erred in not considering identified Listing when plaintiff "[did] not present any evidence that he argued to the ALJ that the combination of his impairments met [that Listing]").

In any event, the evidence of record was insufficient to show that Plaintiff met either Listing. Plaintiff asserts that his "hypertension, mass on his head, and coronary angiography" mandated a finding of disability under Listings 4.00 et seq. and 12.06. (J. Stip. at 7 (citing AR 616-24, 630-44).) He has failed to meet his burden to show how these listings were satisfied.

Listing 4.00 covers impairments of the cardiovascular system. 20 C.F.R. § 404, subpt. P, app. 1, § 4.00 et seq. A claimant can meet Listing 4.04C (Coronary artery disease) if he can demonstrate "by angiography (obtained independent of Social Security disability evaluation)" evidence showing:

a.   50 percent or more narrowing of a nonbypassed left
     main coronary artery; or

b.   70 percent or more narrowing of another nonbypassed
     coronary artery; or

    c.    50 percent or more narrowing involving a long (greater than 1 cm) segment of a nonbypassed coronary artery; or

    d.    50 percent or more narrowing of at least two nonbypassed coronary arteries; or

    e.    70 percent or more narrowing of a bypass graft vessel; and

    2.    Resulting in very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living.

Id. § 4.04C.  To meet a Listing based on hypertension (high blood pressure), a claimant must show that it has affected other body systems, such as the heart, brain, kidneys, or eyes.  Id. § 104.00F.  In the case of the heart, a claimant must present evidence of heart disease resulting in one or more of the following four consequences:

    (i)    Chronic heart failure or ventricular dysfunction.

    (ii)    Discomfort or pain due to myocardial ischemia, with or without necrosis of heart muscle.

    (iii)    Syncope, or near syncope, due to inadequate cerebral perfusion from any cardiac cause, such as obstruction of flow or disturbance in rhythm or conduction resulting in inadequate cardiac output.

    (iv)    Central cyanosis due to right-to-left shunt, reduced oxygen concentration in the arterial blood, or pulmonary vascular disease.

Id. § 4.00A.

Plaintiff has not met his burden to show that he met or equaled any of the impairments in Listing 4.00 et seq. As the ALJ correctly found, tests performed in 2008, 2009, and 2010 showed that Plaintiff's blood pressure was normal and he had no cardiac dysfunction. (AR 22, 567-68, 632, 636-39.) A June 6, 2008 angiogram showed only slight abnormalities in Plaintiff's temporal artery. (AR 22, 567-68.) A physical examination performed in November 2010 revealed normal blood pressure and normal heart functioning. (AR 636-39.) Plaintiff has not met his burden to present evidence showing that he satisfies any of the above-listed criteria.

Listing 12.06 covers anxiety-related disorders. Id. § 12.06. To meet Listing 12.06, a claimant must present the following evidence:

A.   Medically documented findings of at least one of the following:

1.   Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

a.   Motor tension; or

b.   Autonomic hyperactivity; or

c.   Apprehensive expectation; or

d.   Vigilance and scanning;

or

2.   A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

27

3.   Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4.   Recurrent obsessions or compulsions which are a source of marked distress; or

5.   Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

And

B.   Resulting in at least two of the following:

1.   Marked restriction of activities of daily living; or

2.   Marked difficulties in maintaining social functioning; or

3.   Marked difficulties in maintaining concentration, persistence, or pace; or

4.   Repeated episodes of decompensation, each of extended duration.

OR

C.   Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. § 404, subpt. P, app. 1, § 12.06.

Plaintiff has not met his burden to show that he met or equaled Listing 12.06.  As discussed above, there is no evidence that Plaintiff underwent any psychiatric treatment for his anxiety or that it was debilitating in any way; indeed, most of the evidence in the record suggests that Plaintiff's mental

28

functioning was normal.  (See AR 350, 489-90, 588-93, 661-75.)

Plaintiff has therefore failed to meet his burden to show how any listings were satisfied.  Reversal is not warranted on this basis.

B.   The ALJ Did Not Err in Assessing Plaintiff's
     Credibility

Plaintiff argues that the ALJ failed to provide clear and convincing reasons for discounting his credibility.  (J. Stip. at 10-13, 16-17.)  Because the ALJ did provide clear and convincing reasons supporting his evaluation of Plaintiff's testimony and those reasons were supported by substantial evidence in the record, reversal is not warranted on this basis.

1.   Applicable law

An ALJ's assessment of pain severity and claimant credibility is entitled to "great weight."  See Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)."  Molina v. Astrue, 674 F.3d 1104, 1122 (9th Cir. 2012).  In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis.  See Lingenfelter, 504 F.3d at 1035-36.  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged."  Id. at 1036 (internal quotation marks omitted).  If such objective medical evidence exists, the ALJ may not reject a

claimant's testimony "simply because there is no showing that the impairment can reasonably produce the *degree* of symptom alleged." Smolen, 80 F.3d at 1282 (emphasis in original).  When the ALJ finds a claimant's subjective complaints not credible, the ALJ must make specific findings that support the conclusion.  See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010).  Absent affirmative evidence of malingering, those findings must provide "clear and convincing" reasons for rejecting the claimant's testimony.[12]  Lester, 81 F.3d at 834.  If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing."  Thomas, 278 F.3d at 959.

### 2.  Relevant facts

In an undated Disability Report, Plaintiff claimed that his "headaches made it impossible for him to walk around the agency or to sit in an office with the lights on for long periods of time or use the computer to due [sic] any paperwork"; Plaintiff was "in constant pain, so he is unable to concentrate" and "is always fatigued due to lack of sleep caised [sic] by the pain"; and Plaintiff "feels depressed because has [sic] gone through many treatments and have [sic] been unable to solve his illness." (AR 165.)  In a later Disability Report, Plaintiff stated that

---

[12]    There is arguably some evidence in the record of malingering.  For example, in January 2010, Dr. Dhaliwal noted that he was "having some difficulty attributing to [sic] the magnitude of [Plaintiff's] symptoms to his forehead lesion" and expressed doubt that Plaintiff's headaches were attributable to a vascular malformation or temporal arteritis, as Plaintiff appears to have claimed.  (See AR 628.)  In any event, as discussed herein, the ALJ provided clear and convincing reasons for rejecting Plaintiff's credibility.

his migraines had gotten "worse," his blood pressure had gotten
"higher," and he had "developed severe arthritis in my hands and
my back from taking high doses of Prednisone to try to control my
headaches." (AR 188.) He also stated that his "heart
palpitations have gotten worse from my high blood pressure," his
"eyes have become photosensitive from the new medication I was
prescribed," and his "arthritis has gotten worse since they took
me off some of my painkillers." (Id.) He further stated that he
had "trouble concentrating since my migraines have gotten worse"
and had "trouble with my heart since my pain has become worse."
(Id.) He stated that he was "unable to do my job anymore because
I can no longer concentrate like I use [sic] to working with
numbers and financing." (AR 195.)

When Dr. Sherrill examined Plaintiff in March 2010, she
noted that he drove himself to the clinic for his evaluation and
that he reported that he was "able to perform all basic household
chores unassisted and is capable of running errands and going
shopping alone, but prefers not to do so." (AR 588, 590.) He
reported "good relationships with family members and good
relationships with friends, acquaintances and neighbors." (AR
590.) She noted that he "stated that he is able to cook meals
without help, but does not like doing so," and "[h]is current
preferred activities include watching television." (AR 590.)
Plaintiff also reported that he was able to "perform all self-
care activities independently, including dressing and bathing
himself," and was able to manage his own finances and drive his
own car. (AR 590.)

Dr. Sherrill noted that Plaintiff reported the following

31

symptoms:

> According to the claimant, his primary problems and
> disabilities are medical.  He stated that his primary
> disability is that he has catastrophic medical problems.
> The claimant has severe and debilitating migraine
> headaches every day.  The claimant has been placed on
> disability because he was in such extraordinary pain that
> he was not able to do his job.  The claimant has seen
> numerous physicians including physicians at the Mayo
> Clinic.  He received a different diagnosis from almost
> every physician.  The claimant stated that as a result,
> he is chronically frustrated and distracted, resulting in
> an inability to concentrate and focus.

> Additionally, the claimant stated that he
> experiences routine lapses in memory.  The claimant
> recognizes that he has an excellent memory but he is
> extraordinarily distracted because of his medical
> problems.  The claimant reported that he now has chronic
> anxiety and depression.  The claimant has extraordinary
> financial worries because of his medical condition and
> lack of employment.  He has three small children.  The
> claimant is now chronically depressed because of the
> catastrophic medical problems and his pain along with
> pain management problems.  However, he denied any history
> of suicidal ideation.  He has no history of homicidal
> thoughts.  The claimant further reported impaired sleep
> and appetite.

(AR 589.)

1    At the hearing, Plaintiff testified that he had not worked
2  since January 1, 2009.  (AR 47.)  He stated that Dr. Wallen
3  advised him to stop working at that time because "the stress was
4  showing too much on me; the strain because I was getting sicker."
5  (AR 48.)  He testified that he saw a primary-care physician, a
6  neurologist, and a pulmunologist but did not see a mental-health
7  professional and did not see his cardiologist "on a regular
8  basis."  (AR 48-51.)  He stated that he stopped working because
9  of "absolutely unbearable" pain on the right side of his head
10 "that just never stops."  (AR 51.)  He stated that he also had
11 hypertension that was controlled "to an extent" with medication
12 but flared up when he had "severe pain," and he also had "heart
13 palpitations" caused by his headache pain.  (AR 53, 66.)  He
14 stated that his headache had "not gone away" since his symptoms
15 began, and he recounted that the medical tests he underwent
16 between 2008 and 2010 did not produce a conclusive diagnosis.
17 (AR 53-56.)  He testified that his doctors told him there was "no
18 cure" for his headaches and that they were becoming "more severe"
19 over time.  (AR 60-61.)

20    As to his daily activities, Plaintiff testified that he
21 "[didn't] really do too much of anything" during the day but was
22 able to drive to the grocery store, post office, and pharmacy.
23 (AR 56-57.)  He stated that he did not do yard work or laundry
24 and took care of his children only on days when the nanny did not
25 work.  (AR 57-58, 69.)  He stated, however, that he drove to his
26 eldest daughter's school to meet with the vice principal once
27 every four months because his daughter had a learning disability.
28 (AR 58.)  He stated that he did not socialize with friends or

family and stayed home while his wife participated in social activities, but he saw his family "at home to have dinner with them and talk to them and stuff." (AR 58-59, 69.) He claimed that he lied down and slept most of the day and did not read or watch TV "because that's more of a distraction and actually causes more of a headache." (AR 64.) He stated that some of his medications made him drowsy. (AR 65.) He testified that he slept "several hours during the day," from approximately 1 to 5 p.m. (AR 68.)

Plaintiff also testified that he had difficulty standing and walking because of osteoarthritis, which was diagnosed in June 2009 and was caused by taking Prednisone. (AR 61.) He testified that he could stand and walk for "[t]wenty or thirty minutes" before needing to sit, could sit "for at least an hour," and could carry or lift "[l]ess than five to ten pounds." (AR 62.) He testified that his diabetes was "out of control" and his blood sugars were "[i]ncredibly high," which made him feel "very shaky." (AR 66-67.)

With respect to his headaches, Plaintiff testified that on his "best" day his pain was a "three" and on his "worst" day it was "at a 10," and his pain reached level 10 "about twice a week." (AR 64.) He stated that he was "like a five to seven most of the time." (<u>Id.</u>) He testified that he could not work because his headache pain would cause him to lose concentration, "and with the medication I take that caused it just to be that much worse." (AR 68.)

    3.   <u>Analysis</u>

The ALJ found that Plaintiff's "medically determinable

34

impairments could reasonably be expected to cause the alleged symptoms," but his "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with" the ALJ's RFC assessment. (AR 24.) The ALJ noted that despite Plaintiff's claims of severe depression and anxiety, he had never sought mental-health treatment, and Dr. Sherrill's examination revealed no cognitive dysfunctions, memory problems, or thought impairments. (AR 22, 24.) He then made the following findings regarding Plaintiff's daily activities:

> In addition to the objective findings of no severe mental impairment, neither activities of daily living nor social interactions were restricted by either mental or physical conditions (Testimony; [(AR 614-28, 659-75)]). The claimant does basic household chores, shops, cooks, and drives three times a week [(AR 590).][13]  He spends much of his time watching television, a sedentary activity.  He likes to play the guitar [(AR 498)].[14]  The claimant reports good relations with family and friends when he described his medical-social history to Dr. Sherrill.  He goes to his child's school to review the child's IEP (Testimony).

---

[13]   The ALJ cited Exhibit "9F/3" in support of this assertion.  That appears to have been a typographical error – the evidence to which the ALJ referred in fact appears on page 3 of Exhibit 6F (AR 590).

[14]   This citation also contains a typographical error.  The ALJ cited Exhibit "11F/92," but the evidence he discusses appears on page 92 of Exhibit 5F (AR 498).

1  (AR 24.)   The ALJ then discussed the lack of support in the

2  record for Plaintiff's claims regarding his medical conditions.

3  (AR 24-25.)

4       Reversal is not warranted based on the ALJ's alleged failure

5  to make proper credibility findings or properly consider

6  Plaintiff's subjective symptoms.  As discussed above, the ALJ's

7  evaluation of the medical evidence was consistent with the

8  record; his rejection of Plaintiff's testimony to the extent it

9  was inconsistent with the objective evidence was therefore

10 proper.   See Carmickle, 533 F.3d at 1161 ("Contradiction with the

11 medical record is a sufficient basis for rejecting the claimant's

12 subjective testimony."); Lingenfelter, 504 F.3d at 1040 (in

13 determining credibility, ALJ may consider "whether the alleged

14 symptoms are consistent with the medical evidence"); Burch, 400

15 F.3d at 681 ("Although lack of medical evidence cannot form the

16 sole basis for discounting pain testimony, it is a factor that

17 the ALJ can consider in his credibility analysis."); Kennelly v.

18 Astrue, 313 F. App'x 977, 979 (9th Cir. 2009) (same); see also

19 Tommasetti v. Astrue, 533 F.3d 1035, 1040 (9th Cir. 2008) (ALJ

20 may infer that claimant's "response to conservative treatment

21 undermines [claimant's] reports regarding the disabling nature of

22 his pain").  Indeed, the ALJ's finding that the "intensity" of

23 Plaintiff's reported symptoms could not be reconciled with the

24 medical evidence was consistent with Dr. Dhaliwal's observation

25 that he was "having some difficulty attributing to [sic] the

26 magnitude of [Plaintiff's] symptoms to his forehead lesion" and

27 had doubts that Plaintiff's headaches were attributable to a

28 vascular malformation or temporal arteritis, as Plaintiff appears

1  to have claimed.  (See AR 24. 628.)

2      Moreover, as the ALJ noted, Plaintiff admitted to Dr.

3  Sherrill that he was able to do a wide variety of daily

4  activities, including driving, doing household chores, cooking,

5  performing self-care functions, handling money, and socializing

6  with his family, but simply "prefers not to do so." (AR 24,

7  590.) Plaintiff also reported to Dr. Wallen in January 2009 that

8  he played the guitar. (AR 498.) Plaintiff does not argue that

9  Dr. Sherrill's or Dr. Wallen's descriptions of his daily

10  activities were inaccurate in any way. Plaintiff also testified

11  that he was able to drive several times a week and regularly met

12  with administrators at his daughter's school to review her

13  education plan. (AR 56-58.) That Plaintiff's allegations of

14  disabling pain were inconsistent with evidence in the record as

15  to his daily activities was a valid reason for the ALJ to

16  discount his testimony. See Bray v. Comm'r of Soc. Sec. Admin.,

17  554 F.3d 1219, 1227 (9th Cir. 2009) (ALJ properly discounted

18  claimant's testimony because "she leads an active lifestyle,

19  including cleaning, cooking, walking her dogs, and driving to

20  appointments"); Berry, 622 F.3d at 1234-35 (holding that when

21  claimant "told medical staff he engaged in daily walks of a mile

22  or more, had various social engagements, drove his car and did

23  crossword puzzles, computer work, pet care, cooking, laundry and

24  other house-keeping," ALJ properly discounted claimant's

25  credibility based on "inconsistencies in [claimant's] reported

26  symptoms and activities"); Molina, 674 F.3d at 1113 ("Even where

27  [claimant's] activities suggest some difficulty functioning, they

28  may be grounds for discrediting the claimant's testimony to the

37

extent that they contradict claims of a totally debilitating impairment.").

Because the ALJ gave clear and convincing reasons for his credibility finding and those reasons were supported by substantial evidence, the Court "may not engage in second-guessing." Thomas, 278 F.3d at 959 (citation omitted). Plaintiff is not entitled to reversal on this claim.

C. The ALJ Did Not Err in Determining Plaintiff's RFC

In issues four and five, Plaintiff contends that the ALJ erred in determining that he retained the RFC to perform light work and could perform his past relevant work. (J. Stip. at 17-22). Reversal is not warranted on these bases.

A district court must uphold an ALJ's RFC assessment when the ALJ has applied the proper legal standard and substantial evidence in the record as a whole supports the decision. Bayliss, 427 F.3d at 1217. The ALJ must have considered all the medical evidence in the record and "explain in [his or her] decision the weight given to . . . [the] opinions from treating sources, nontreating sources, and other nonexamining sources." 20 C.F.R. § 404.1527(e)(2)(ii). In making an RFC determination, the ALJ may consider those limitations for which there is support in the record and need not consider properly rejected evidence or subjective complaints. See Batson, 359 F.3d at 1197-98 ("ALJ was not required to incorporate evidence from the opinions of [plaintiff's] treating physicians, which were permissibly discounted"); Bayliss, 427 F.3d at 1217 (upholding ALJ's RFC determination because "the ALJ took into account those limitations for which there was record support that did not

depend on [claimant's] subjective complaints"). The Court must consider the ALJ's decision in the context of "the entire record as a whole," and if the "evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) (internal quotation marks omitted).

Plaintiff argues, without elaborating, that the ALJ's RFC finding was in error because it did not account for Plaintiff's alleged depression, anxiety, or "physical pain." (J. Stip. at 18, 20-22.) It is Plaintiff's burden at step four to prove that he is unable to perform past relevant work. Drouin, 966 F.2d at 1257. Plaintiff's conclusory arguments without citation to the record are insufficient to meet his burden. See Carmickle, 533 F.3d at 1161 n.2 (rejecting argument when claimant "failed to argue [it] with any specificity in his briefing"); see also Rogal v. Astrue, No. C12-5158-RSL-BAT, 2012 WL 7141260, at *3 (W.D. Wash. Dec. 7, 2012) ("It is not enough merely to present an argument in the skimpiest way, and leave the Court to do counsel's work - framing the argument and putting flesh on its bones through a discussion of the applicable law and facts."), accepted by 2013 WL 557172 (W.D. Wash. Feb. 12, 2013). As discussed in Section V.A above, the ALJ's evaluation of Plaintiff's impairments was supported by substantial evidence in the record. The consulting examiner also found that Plaintiff was capable of doing light work. (AR 403.) Plaintiff has not met his burden to show that that finding was in error.

Plaintiff argues that the ALJ's hypothetical to the VE was improper because it "did not contain a true function-by-function

assessment of the plaintiff's limitations." (J. Stip. at 19.)
Plaintiff does not identify the specific functions that the ALJ
failed to include in the hypothetical, but to the extent he
argues that the ALJ should have included additional limitations
that were found to be not credible or not supported by the
record, the ALJ did not err. See Bayliss, 427 F.3d at 1217
(holding that "[p]reparing a function-by-function analysis for
medical conditions or impairments that the ALJ found neither
credible nor supported by the record is unnecessary" and that ALJ
may rely on VE response to hypothetical that "contained all of
the limitations that the ALJ found credible and supported by
substantial evidence in the record").

Plaintiff also argues that the hypothetical was "lacking"
because it did not take into account new medical evidence, in
particular the evidence from the Mayo Clinic. (J. Stip. at 19,
AR 72.) As detailed above, however, the Mayo Clinic evidence was
consistent with the other evidence of record demonstrating that
Plaintiff's test results did not show any significant
abnormalities and doctors could not find an explanation for
Plaintiff's headaches. (See AR 616, 619, 628.) Moreover, as
discussed above, to the extent Dr. Dhaliwal's statement that
Plaintiff's headaches were "debilitating" was meant to evaluate
his medical condition, the ALJ properly rejected it. Reversal is
not warranted on this basis.

**VI.   CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[15] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.   IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.

DATED: May 22, 2013

_____
JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[15]   This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."